ST. JOSEPH LIGHT & POWER COMPANY, Plaintiff-Appellant,

v.

KAW VALLEY TUNNELING, INC., I. V. Cunningham, Sr., St. Joseph Water Company, Defendants-Respondents,

and

City of St. Joseph, Missouri, Defendant-Appellant.

CITY OF ST. JOSEPH, MISSOURI, Third Party Plaintiff-Appellant,

and

St. Joseph Water Company, Third Party Plaintiff-Respondent,

v.

BLACK AND VEATCH, CONSULTING ENGINEERS, Third Party Defendant-Respondent.

No. 60862.

Supreme Court of Missouri, En Banc.

Nov. 14, 1979.

Rehearing Denied Dec. 6, 1979.

Charles S. Wilcox, St. Joseph, for plaintiff-appellant.

G. Steven Ruprecht, F. Philip Kirwan, Kansas City, for defendants-respondents.

John R. Caslavka, Kansas City, for third party defendant-respondent.

Gary A. Fenner, St. Joseph, for third party plaintiff-appellant.

SEILER, Judge.

This action is by the St. Joseph Light & Power Company ("Power Company") to recover for damages to its buildings and facilities resulting from the construction of a sewer by the city of St. Joseph ("city"). The Power Company's petition was filed in three counts. Counts I and II alleged damages resulting from the negligence of defendants Kaw Valley Tunneling, Inc., and I. V. Cunningham, Sr., joint venturers ("Kaw Valley"), the city, and the St. Joseph Water Company ("Water Company"). Both counts charged negligence on the part of Kaw Valley in (1) causing excessive vibration in the driving of piling; (2) inadequately investigating subsoil conditions; and (3) continuing to pursue an unsafe method of operation, knowing it was likely to cause damage to property adjacent to the work. The Water Company was charged with permitting its mains and valves to leak, resulting in excessive saturation of the subsoil, causing or contributing to cause the sinking of Second Street and the undermining of the duct bank and manhole. The city was charged with negligence in failing to exercise proper control over Kaw Valley and in failing to take proper steps to avoid damage to property of others when it knew that continuation of the original method of construction would be likely to cause such damage.

Count III was an alternative cause of action to recover as a third party beneficiary of the contract between Kaw Valley and the city. The city cross-claimed against Kaw Valley for indemnity, and filed a third party petition against Black and Veatch, consulting engineers employed by it to design the sewer and to prepare plans and specifications for it, alleging breach of the latter's contract with the city and negligence in the performance of its contractual duties. The Water Company filed a third party petition against Black and Veatch and a cross-claim against Kaw Valley.[1]

1. Chesmore Seed Company also filed suit against Kaw Valley Tunneling, Inc., and I. V. Cunningham, Sr., the city of St. Joseph, and the St. Joseph Water Company. A motion to consolidate the case of Chesmore Seed Company with that of St. Joseph Light & Power Company was sustained, and subsequent to the trial, judgment was entered in favor of all defendants and against Chesmore Seed Company. Chesmore Seed Company filed, but has since withdrawn, an appeal.

The trial court, sitting without a jury, entered judgment in favor of the Power Company and against the city in the amount of $18,450.00 and in favor of Kaw Valley and the Water Company. The cross-claims and the third party petitions were dismissed. The city appeals from the dismissal of its cross-claim against Kaw Valley and its third party claim against Black & Veatch, as well as from the judgment against it in favor of the Power Company. The Power Company appeals from the judgment in favor of Kaw Valley and the Water Company, and from the judgment in its favor against the city insofar as the amount of recovery is concerned.

The court of appeals affirmed the trial court in all respects save reversal against Kaw Valley with directions to enter judgment in favor of the Power Company for $18,450.00 as a third party beneficiary of the construction contract as alleged in Count III of the original petition.

Transfer was granted upon application of Power Company and Kaw Valley to deal primarily with two questions. First, whether Kaw Valley is liable to a third party beneficiary of its contract with the city in the face of a trial court finding that Kaw Valley did not breach any provisions of that contract. Second, whether the measure of damages applied by the trial court, diminution of value, is the proper measure or whether the cost of repair or replacement (including cost of razing plaintiff's damaged building), which the Power Company alleges is provided for under the contract, is appropriate. While we will deal with the case as though here on original appeal, we incorporate portions of the opinion of the court of appeals without quotation marks.

The sequence of events giving rise to the damage complained of by the Power Company is as follows: The construction of the interceptor sewer resulted from an order of the federal court for the western district of Missouri in a suit brought by the United States against the city of St. Joseph to secure abatement of the pollution of the Missouri River by the city. Prior to construction of the sewer, untreated sewage was dumped into the Missouri River. The city employed Black & Veatch, consulting engineers, to design and prepare specifications for a 48″ interceptor sewer running some 5,200 linear feet between Mitchell Avenue and Powell Street, to include five diversion structures and seven line manholes. The design called for the location of the sewer approximately thirty to forty feet below the ground. For the most part, and in the area of immediate concern in this litigation, the line of the sewer was driven underground in tunnel fashion. Plaintiff, Power Company, received notice of the planned sewer tunnel construction in August, 1970.

Between Edmond and Felix Streets, the sewer runs beneath Second Street, generally in the center of the street at the above stated depth below the surface. The Power Company owned property on the west side of Second Street, including a three-story building at the southwest corner of Second and Felix which was leased to Chesmore Seed Company (the Chesmore Building), a three-story plant office building immediately south of the Chesmore Building and a two-story building at the northwest corner of Second and Edmond, used for lockers and a lunch room. A substation was located between the locker building and the office building.

A Power Company duct bank was located below the surface of Second Street, between the sewer location and the west curb of the street. This duct bank entered a manhole known as "Manhole No. 2" in the intersection of Second and Edmond Streets. The duct bank proceeded from the manhole east under Edmond Street. An 8″ main of the Water Company ran parallel to the duct bank along Edmond Street. The Missouri River ran only a few blocks away.

Tunneling for the sewer proceeded in a generally south to north direction between access shafts constructed by Kaw Valley located at each of the seven manhole sites. An 18′ diameter shaft was excavated to the depth of the sewer and lined with metal plates to support the walls. A metal shield was used to cut out the earth for the sewer

tunnel in an operation described as "like a cookie cutter." Hydraulic jacks pushed against timbers on the rear of the shield in three-foot "pushes." Spoil material was drawn through the face of the shield like toothpaste from a tube. Timbers were immediately placed behind the shield, on both sides and the top of the tunnel, to avoid cave-in until the permanent cement collar for the sewer was laid. The spoil material moved on a conveyor belt to the access shaft where it was removed by a clam shell bucket. As the tunneling proceeded north toward Edmond, considerable water was encountered. In September, 1971, cave-ins large enough for a truck to fall into appeared along the tunneling route which had been completed between Charles and Edmond Streets.

Excavation for an access shaft at Second and Edmond had begun in early March, 1971, but the work stopped because of excessive water. Work on that shaft resumed September 9, with the removal of liner plates previously placed in the shaft and their replacement by sheet piling installed by a pile driver. On September 17, employees of the Power Company noted the activity at the shaft and observed cracks in the street pavement around the shaft and some subsidence in the street to the south. Ralph B. Mayer, the Power Company's vice-president of operations, noted that the pile driving operation was causing considerable vibration in the area. Mr. Mayer was concerned about possible damage to the Power Company's duct bank which ran near the shaft and had Mr. Endebrock, the city's director of public works, request the contractor to stop. At Mayer's request, the contractor then removed the street pavement from the duct bank so that it could be examined for damage. The duck bank and the Power Company's Manhole No. 2 were inspected and found to be intact. Work then proceeded on the shaft and the tunnel.

On September 24, Mayer went to the Second and Edmond location in response to a call from Black & Veatch's inspector. The duct bank had cracked in three or four places and some twenty feet of the bank were sagging and portions of it had moved horizontally. There was mud under the duct bank and between it and the access shaft, and dirt had washed from under the duct bank, permitting it to settle. An 8" main of the Water Company some three feet south of the duct bank was found to have broken. The water was shut off and the break repaired by the Water Company. The breaks in the displacement of the duct bank rendered it unusable and the Power Company was obliged to make emergency arrangements to supply power to the portions of the downtown area served by the duct bank. Eventually forty feet of the duct bank, as well as Manhole No. 2, had to be replaced.

At about this time cracks appeared in the walls of the locker room building and the sidewalk pulled away along the front of the building. The Power Company arranged for a coat of gunite to be applied to the south wall of the building. Near the end of September, the tunneling operation stopped for some time while alternative methods of completing the job were considered and discarded as not feasible or too expensive. Work resumed in early January, 1972, and the tunneling eventually reached Felix Street. As the work progressed under Second Street, the surface of the street subsided along the line of the tunnel, about fifteen feet behind the tunnel face. The maximum subsidence of about three feet was in the center of the streets over the tunnel and it extended to the curbs. Cracks appeared in the sidewalk along the west side of Second Street. The sidewalk pulled away from the office building and later from the Chesmore Building. The edge of the loading dock at the building fell an inch or two and the loading dock had to be removed. As more cracks appeared in the wall of the building, concern arose about the safety of the structure. Engineers examined the building and decided that the structure should be razed. This was done at a cost of $12,000 to Power Company. When the building was removed, it became necessary to waterproof the north wall of the office building at a cost of $1,500.00.

After a lengthy trial, the trial court entered findings which included the following:

"The evidence clearly established the existence of excessive water in the ground, or voids filled with water, below Second Street in the path of the construction tunnel, and that removal of the water removed volume from the ground, resulting in the subsidence of Second Street and the ground above and on either side of the tunnel   .   .   .

"The evidence also clearly established that Kaw Valley complied with all of the General and Special Conditions and Specifications contained in the contract documents. The question now concerns the liability for damage resulting from ground conditions unknown to any of the parties prior to entering into the contract
  .   .   .

"   .   .   .   The responsibility for adequately investigating the condition of the soil through which it planned construction, and for providing plans and specifications which, when followed by the contractor, would not result in damage to third persons, was that of the city and could not, when found to be inadequate, be shifted to the contractor."

The court further found that, with the exception of the Chesmore Building and the steam line, the evidence of the Power Company as to damages was limited to the cost of replacement or repair of the damaged structures.[2] The court held that such evidence did not reach the applicable measure of damages, i. e., the difference in value of the property immediately before and immediately after the damage. The court did find evidence that the Chesmore Building had a value of $18,000 before it was damaged and awarded the Power Company judgment against the city for that amount, plus $450.00 for damage to the steam line.

The appeals of the Power Company and the city from the judgment have been consolidated. The city's appeal will be considered first.

The city's first contention is that the trial court erred in overruling its motion to dismiss, which had asserted that the construction of the sewer in this case was a governmental function for which the city was immune from liability in tort.[3] The city presents a complex and lengthy argument on this point. It notes that while this court has traditionally denied immunity to municipal corporations for acts performed in the construction of sewers on the basis that in so acting they are performing a proprietary rather than a governmental function, *Cook v. City of Kansas City,* 358 Mo. 296, 214 S.W.2d 430, 432 (1948); *Bean v. City of Moberly,* 350 Mo. 975, 169 S.W.2d 393, 397 (1943); *Donahew v. City of Kansas City,* 136 Mo. 657, 38 S.W. 571 (1897); *Clark v. City of Humansville,* 348 S.W.2d 369, 374–75 (Mo.App.1961), we have also held that sewer districts, which can only act in a governmental capacity, do enjoy immunity for performance of these same acts, *Page v. Metropolitan St. Louis Sewer District,* 377 S.W.2d 348 (Mo.1964). The city argues that, if the nature of the act—building a sewer—is decisive in determining whether an act is proprietary or governmental, then the same standard should apply whether the governmental unit is a sewer district or a municipal corporation; since we have more recently held that the acts of sewer districts in constructing sewers are govern-

---

2. In addition to the loss of the Chesmore Building and the damage to the steam line, the Power Company was also claiming $40,160.48 for damage to the duct bank, the manhole and for providing emergency and temporary facilities to replace the damaged structure, $7,500 for repairs to a brick building at one of the corners, $5,888.00 for replacement of sidewalks, $1,025.98 for temporary repairs to and removal of a loading dock near another corner, $1,500.00 for repairs to the other building in the center of the block on Second Street and $12,-000.00 for razing of the Chesmore Building.

3. In *Jones v. State Highway Commission,* 557 S.W.2d 225 (Mo. banc 1977), this court prospectively abolished governmental immunity, effective August 15, 1978. The delay was allowed, among other reasons, in order to permit the legislature to determine whether to reinstate immunity by statute. It has done so, § 537.600, RSMo 1978. In any case, the case at bar was tried prior to *Jones.*

mental, then so must be those same acts when performed by a municipal corporation regardless of the fact that the latter has the capacity to perform proprietary functions also.

■ While this argument is appealing, the seeming inconsistency between the two types of cases can be resolved. A municipal corporation, by its nature, can perform both proprietary and governmental functions. Thus a court must look to the nature of the activity performed to determine in which capacity the city has acted. Sewer construction falls into the former category because a city so acts in its capacity as a private corporation for the benefit of its residents, and the sewer constructed becomes its property. *See* 18 McQuillen, Municipal Corporations § 53.125 at 466 (3d rev. ed. 1977). A sewer district, in contrast, is a public corporation, an arm of the state, and can by its nature perform only governmental functions. We need not proceed to the second tier of the analysis to determine whether it acts in a proprietary capacity in constructing a sewer because the laws which establish it allow it no such capacity. *See* discussion, *Page v. Metropolitan Sewer District*, 377 S.W.2d at 352–53; *State ex rel. Hausgen v. Allen*, 298 Mo. 448, 250 S.W. 905, 906 (banc 1932). It thus must form an exception to the basic rule that the type of activity involved determines the capacity in which the city acts.

■ The city also argues that tort liability should only apply in the case of construction of storm sewers, not sanitary sewers, since the latter are intended for preservation of the public health and hence are a governmental exercise of the police power. This distinction is made in the Texas courts, *see e. g., Gotcher v. City of Farmersville*, 137 Tex. 12, 151 S.W.2d 565 (1941). Suffice it to say that this court has never recognized a distinction between construction of the two types of sewers. *See Clark v. City of Humansville*, 348 S.W.2d at 374, involving a sanitary sewer. The type of activity is the same in both cases, and the same rule should apply.

■ Finally, the city argues that *Donahew v. City of Kansas City*, 136 Mo. 657, 38 S.W. 571 (1897), a leading case in the area, recognizes that in planning a sewer a city acts in a governmental capacity, even if it acts in a proprietary capacity in constructing it, and that here the circuit court found the city's negligence to be in its failure adequately to investigate the condition of the soil through which it was planning to run the sewer. However, *Donahew* recognized as governmental only broad planning decisions such as whether or not to build a sewer system, the extent of the system and the amount to be spent thereon. It quoted with approval the following from Jones, Negligence of Municipal Corporations 267 (1892), as do we:

"But as soon as the corporation has determined to construct a public work, it enters upon an undertaking which, in all its details, should be subordinated to the rule requiring the use of care, for the work is then ministerial." 38 S.W. at 573.

The city is not immune from liability in this case.

■ The city next contends that the trial court erred in finding it committed actionable negligence, and asserts alternatively that the Power Company was guilty of contributory negligence barring any recovery. In support, the city engages in an extensive discussion of the duty of landowners to provide lateral support for adjoining lands. As it notes, while there is an absolute duty not to remove lateral support for adjoining land in its natural state, there is no absolute duty to provide additional lateral support for structures encumbering the adjoining land. *Royal Indemnity Co. v. Schneider*, 485 S.W.2d 452 (Mo.App.1972). In such a case, the landowner's duty is to continue to provide support for the land itself, to provide notice to his neighbor of the excavation so that the latter can protect his property, and to perform the excavation with reasonable care. *Id.; Flanagan Bros. Mfg. Co. v. Levine*, 142 Mo.App. 242, 125 S.W. 1172 (1910).

■ The difficulty with the city's argument is that the trial court found that the

city was negligent in failing to investigate adequately the condition of the soil prior to tunneling. It did not impose liability merely because lateral support was withdrawn. The failure of the city to use due care in this regard constitutes actionable negligence as to the Power Company, whose buildings were damaged as a result thereof, *S.H. Kress & Co. v. Reaves*, 85 F.2d 915, 917 (4th Cir. 1936), *cert. denied*, 299 U.S. 616, 57 S.Ct. 322, 81 L.Ed. 454 (1937); *Schneider*, 485 S.W.2d at 459.

■ The city further alleges that the Power Company was contributorily negligent in failing to support its buildings and thus the city is not liable for its damages. The city did not plead contributory negligence as a defense. Consequently, it may prevail on that theory on appeal only if the Power Company's own evidence shows contributory negligence as a matter of law. *Dalby v. Hercules, Inc.*, 458 S.W.2d 274, 280 (Mo.1970); *Lanio v. Kansas City Public Service Co.*, 162 S.W.2d 862 (Mo.1942). As in any other case, the question of plaintiff's negligence is for the jury or, as here, the court acting as the trier of fact. The court did not find plaintiff Power Company negligent.

The city relies upon the absence of evidence that, after the Power Company was notified of the commencement of the project, it took steps to protect its property. There was no evidence of what, if anything, the Power Company might have done in this case which would have protected against the subsidence of support for its building. The city points to the weight of the seed stored by Chesmore in the building. However, it points to no testimony which related the defects which appeared in the structure to such weight. At the most, there was evidence from which contributory negligence might have been inferred, but it does not appear as a matter of law and the trial court was not obligated to draw such an inference.

The city alleges, however, that even if it could be liable for removal of soil, here the trial court found the subsidence of the land to be a result of removal of water. The city claims that a landowner may remove percolating water with impunity, citing Restatement of Torts § 818, at 199 (1939). We need not decide that question where, as here, the city was negligent, and the injured landowner not contributorily negligent. The city is clearly liable for damages. Restatement (Second) of Torts § 819 (1979); Restatement of Torts § 819 (1939); *A. L. Russell v. City of New York*, 4 A.D.2d 943, 168 N.Y.S.2d 159 (1957). The circuit court was not in error in holding the city liable to the Power Company.

■ As its third point, the city alleges that the trial court erred in finding no negligence on the part of Kaw Valley, yet finding the city liable "apparently on the theory of respondeat superior." The answer to this is that the court found the city liable because the city was negligent in the performance of its duty to provide exploratory work and test the soil necessary for preparation of the plans for the sewer tunnel. The theory of respondeat superior does not enter the case. The city complains that the contractor is much more experienced in regard to tunneling, and that it is unfair to hold the city negligent for not knowing something of which even the contractor was not aware. However, the contractor did not assume the duty to determine soil conditions. On the other hand, the city's duty, as landowner, to use due care is a non-delegable one. As stated in *S.H. Kress & Co. v. Reaves*, 85 F.2d at 918:

"It is contended on behalf of the appellant that the negligence, if any, was the negligence of the G. A. Miller Company, the contractor, and that that company, being an independent contractor, and not the appellant, should be liable for any damage that resulted to the plaintiff's property. We do not think this contention can be sustained. The performance of the duties of *ascertaining in advance the character of the soil to be excavated* and of giving a proper notice of the nature and extent of the excavation, to the adjoining property owner, rested in the first instance on the appellant and *were*

*absolute and nondelegable duties from which the appellant could not be relieved by any contract with a third party,* and the verdict exonerating the contractor and holding the appellant liable was not inconsistent" (citations omitted) (emphasis added).

The city is thus liable for failure to use due care even though the party which actually performed the excavation was an independent contractor. *See Schnieder,* 485 S.W.2d at 460.

The city next complains that the trial court erred in permitting Ralph B. Mayer to testify regarding his opinion of the fair value of the Chesmore Building because he was not an expert on the valuation of property. Mayer was vice-president of operations of the Power Company and was in charge of construction and physical operations of the company. The Chesmore Building was among his responsibilities. The trial court permitted the testimony on the theory that Mayer was an officer of the corporate owner. The city contends that the rule which permits an owner to express his opinion on the value of property owned by him, *Stockton v. Tester,* 273 S.W.2d 783, 788 (Mo.App.1954), without having qualified as an expert does not extend to a person in Mayer's position.

Appellant cites no cases in support of this argument. The Power Company cites 32 C.J.S. *Evidence* § 546(116), at 435 (1964), which states:

"It has been held that the rule that the owner is qualified applies to corporate as well as individual owners, and that the managing officer of a corporation may testify as to the value of property owned by the corporation; but a corporate officer other than the managing officer is not by reason of his office alone qualified to testify as to the value of particular property owned by the corporation."

No Missouri cases have been cited in support of this argument. However, since the time this point was briefed the above rule has been quoted with approval in *Krug v. United Disposal, Inc.,* 567 S.W.2d 133, 135 (Mo.App.1978). In that vehicle collision case defendant counterclaimed for damages, making an offer of proof of the value of its truck before and after the collision through offer of the testimony of defendant corporation's maintenance manager. The court of appeals held that such testimony should have been admitted. As that court noted, the courts are liberal in permitting an owner to testify as to the value of his property, although he is not qualified as an expert, *Hood v. M.F.A. Mutual Ins. Co.,* 379 S.W.2d 806 (Mo.App.1964); *Stockton v. Tester,* 273 S.W.2d at 788 (Mo.App.1954), upon the assumption that he is particularly familiar with it, *Shelby County R–IV School Dist. v. Herman,* 392 S.W.2d 609, 613 (Mo.1965), and there is no reason why a corporate owner should have less rights than an individual owner, *Krug,* 567 S.W.2d at 135. In *Krug,* the court of appeals held the maintenance manager qualified to testify since he would be a corporate officer with unique familiarity with the value of the damaged truck. *Id.* We agree that the testimony of an officer of the corporate owner who stands in a position to value the particular property in question should be admissible. *See Hellstrom v. First Guaranty Bank,* 54 N.D. 166, 209 N.W. 212 (1926); 31 Am.Jur.2d *Expert and Opinion Evidence* § 134 (1967). Mayer was in charge of the Power Company property. He was familiar with the acquisition cost of the Chesmore Building, knew what the Power Company had spent in maintaining and improving it over the years, and knew of the lease to Chesmore. The trial court did not err in permitting Mayer to testify as to the market value of the property.

The city complains that Mayer's valuation of $18,000, arrived at on a capitalization of income basis, should not have been permitted to stand because he did not take into account taxes, insurance and other expenses and did not include a discount factor. Numerous objections to Mayer's testimony were voiced, but this objection was not among them and it will not be considered when raised for the first time on appeal. No error has been shown in the trial court's rulings on Mayer's testimony.

Before considering the city's appeal with respect to the dismissal of its claims against Kaw Valley and Black and Veatch, the Power Company's claim against Kaw Valley will be disposed of. The Power Company contends that the trial court erred in finding in favor of Kaw Valley on Count III of its petition. The Power Company contends that Kaw Valley was obligated by its contract with the city to protect the property of others against damage resulting from the performance of the contract and that the Power Company was a third party beneficiary under such contract and could assert a claim for damages against Kaw Valley on such basis.

Normally, a contractor owes no duty to third parties injured as a result of his operations unless he has performed negligently, or unless the plan was inherently defective and he was or should have been aware of this fact, 63 C.J.S. *Municipal Corporations* § 891b (1950); 13 McQuillin, Municipal Corporations § 37.231–233 (3d rev. ed. 1971); *Meier v. Frank Mashuda Co.*, 10 Ohio App.2d 454, 168 N.E.2d 319 (1959). However, a contractor may by contract assume a greater obligation, *Westerhold v. Carroll*, 419 S.W.2d 73, 80 (Mo.1967); Restatement of Contracts § 145 (1932). Accordingly, we must first determine whether the Power Company was, according to the terms of the contract, a third party beneficiary of that contract, and, if so, whether this third party beneficiary status extends to damages ultimately caused by the city's negligence as found by the trial court.

The Restatement of Contracts § 145 at 173–174 (1932) adopts the following rule:

"§ 145. BENEFICIARIES UNDER PROMISE TO THE UNITED STATES, A STATE, OR A MUNICIPALITY.

"A promisor bound to the United States or to a State or municipality by contract to do an act or render a service to some or all of the members of the public, is subject to no duty under the contract to such members to give compensation for the injurious consequences of performing or attempting to perform it, or of failing to do so, unless,

"(a) an intention is manifested in the contract, as interpreted in the light of the circumstances surrounding its formation, that the promisor shall compensate members of the public for such injurious consequences, . . ."

Illustration 3 of clause (a) states:

"3. A, a municipality, enters into a contract with B, by which B promises to build a subway and to pay damages directly to any person who may be injured by the work of construction. Because of the work done in the construction of the subway, C's house is injured by the settling of the land on which it stands. D suffers personal injuries from the blasting of rock during the construction. B is under a contractual duty to C and D."

Section 145 was approved by the court in *Southwestern Bell Tel. Co. v. J. A. Tobin Const. Co.*, 536 S.W.2d 881, 884 (Mo.App. 1976). Although the court found that the contractor was not liable because Southwestern Bell's own negligence had caused its injuries, it stated:

"This principle of Restatement is sound and, although not heretofore specifically approved by Missouri courts, is consistent with the case law and reasoned principles of such law in this state, . . . So, the sharp focus of the exact point decisive of this appeal bears inevitably upon the terms of the contract between Tobin and the State as to any rights of Bell as a third party beneficiary created thereunder." *Id.* at 884.

So here, we must analyze the terms of the contract to see if the Power Company was an intended, as opposed to merely an incidental, beneficiary thereunder.

The relevant terms of the contract are as follows:

"GC–21. *Protection of Property and Public Liability.* The Contractor shall be accountable for *any damages resulting from his operations.* He shall be *fully responsible* for the *protection* of all persons including members of the public, employees of the Owner, and employees of other contractors or subcontractors, and

*all public and private property including structures, sewers and utilities,* above and below ground . . . .

"GC–28. *Losses from Natural Causes. All loss or damage arising out of the nature of the work,* or from the action of the elements or from floods or overflows, *or from ground water,* or from any unusual obstruction or difficulty, *or any other natural or existing circumstance either known or unforeseen,* which may be encountered in the prosecution of the work, shall be sustained and borne by the Contractor at his own cost and expense . . . .

"SC–14. *Protection of Public and Private Property.* The Contractor shall protect, shore, brace, support, and maintain all underground pipes, conduits, drains, and other underground construction uncovered or otherwise affected by the construction work performed by him. *All* pavement, surfacing, driveways, curbs, walks, buildings, utility poles, guy wires, fences, *and other surface structures affected by construction operations,* together with all sod and shrubs in yards and parkings, *shall be restored to their original condition* as determined and approved by the Engineer, whether within or outside the Owner's right-of-way. *All replacements shall be made with new materials* . . . .

"SC–21. *Damage to Existing Property.* The Contractor will be *held responsible for any damage to existing structures,* work or materials, *because of his operations and shall repair or replace any damaged structures, work or materials,* to the satisfaction of, and at no additional cost to, Owner . . . .

"The Contractor shall *protect all existing structures and property from damage* and shall provide bracing, shoring, or other work necessary for such protection . . . ." (emphasis added).

■■■ As is apparent from a reading of these contract provisions, Kaw Valley agreed without reservation to protect, repair and restore property and structures from damage, including that caused by nat-

ural forces and ground water. In similar cases it has been held that injured property owners are made third party beneficiaries of such a contract and may sue the contractor directly for their damages.

In *Anderson v. Rexroad,* 175 Kan. 676, 266 P.2d 320 (1954), the Kansas Supreme Court was called on to construe a similar contract provision. In that case, a property owner sued the contractor of a street project when his house was destroyed by fire after an employee of the contractor struck a gas pipe line with a bulldozer. The owner relied on the following contract provision:

"Property Damage. The Contractor shall be liable for all damages to buildings, structures, trees, shrubbery, or other property located outside the construction limits, or located within those limits but not designated for removal and not interfering with construction of the proposed improvements. The Contractor, at his expense, shall repair, replace or reconstruct such property or otherwise make amicable settlement of such damage claims within 30 days after the claim is filed . . . ." *Id.* at 323.

The court in *Anderson* held, 266 P.2d at 325–26:

"Moreover in the light of the modern doctrine now prevailing with respect to the maintaining of actions on contract by third party beneficiaries, and independent of questions pertaining to the legality of the contract involved, the great weight of authority in the United States now holds that where an improvement, such as is here involved, is made under a contract between a municipality and the contractor making it, by which the contractor assumes liability for all damages to buildings or other property resulting from the work of constructing the improvement, such contract is to be regarded as for the benefit of an injured property owner who may maintain an action, and if the facts warrant recover, on such contract. See 10 McQuillin (3rd Ed.) Municipal Corporations, 503, 504 § 29.129; 13 McQuillin (3rd Ed.) Municipal Corporations, 629, 631 to

634, Incl. §§ 37.231, 37.233; Restatement Of Law, Contracts, § 145; 4 Corbin On Contracts, 83, 201 §§ 782, 805; 63 C.J.S., Municipal Corporations §§ 1259(d)(2), 1289, pages 994, 1025; 38 Am.Jur., Municipal Corporations, 411 § 708; 43 Am.Jur., Public Works and Contracts, 825 § 82, and cases there cited."

We have reviewed these authorities and they hold that a contract such as that involved here is to be regarded as for benefit of the injured property owner. Thus, in 4 Corbin on Contracts § 805, at 201 (1951) it is said:

"In contracts for the building of subways or for other public construction the contractor has in numerous instances promised the municipality to pay all damages caused to abutting owners by the construction work, whether such damage is due to negligence or not. It has been uniformly held that in case of damage the abutting owners are beneficiaries and can maintain suit on the contract."

In accord with this rule, the Nebraska Supreme Court held, in *Lundt v. Parsons Constr. Co.*, 181 Neb. 609, 150 N.W.2d 108, 110 (1967), under contract language very similar to GC–28 and SC–14 that injured property owners were third party beneficiaries of the contractor's contract with the city and could sue thereunder on the promise to protect and repair existing property. For other cases following this rule, see *George v. Lombardi*, 75 Pa.D. & C. 500 (1951); *Freigy v. Gargaro Co.*, 223 Ind. 342, 60 N.E.2d 288 (1945); *La Mourea v. Rhude*, 209 Minn. 53, 295 N.W. 304 (1940); *Baker v. S. A. Healy Co.*, 302 Ill.App. 634, 24 N.E.2d 228 (1939); and *Congregation Rodeph Sholom v. Bradley Constr. Co.*, 165 N.Y.S. 507, (Civ.Ct.N.Y. 1916).

Kaw Valley cites a number of cases to support its contention that it is not liable to the Power Company. Most of these cases were decided in the late 1800's or early 1900's. *Howsmon v. Trenton Water Co.*, 119 Mo. 304, 24 S.W. 784 (1893) held that lack of privity prevented suit by a citizen whose property was destroyed by fire for damages caused by failure of the defendant

to provide sufficient water pressure, and also found that the citizen was only an incidental beneficiary of the contract between the municipality and the water company. First, we note that cases involving municipal contracts with water companies have historically received different treatment than third party beneficiary cases. *See* 4 Corbin on Contracts, § 806 (1951); *Mott v. Cherryvale Water & Mfg. Co.*, 48 Kan. 12, 28 P. 989 (1892). Secondly, we have held that lack of privity to the parties of the contract need not bar third party recovery, *see Westerhold v. Carroll*, 419 S.W.2d at 79–80. Moreover, in *City of University City ex rel. Mackey v. Frank Miceli & Sons Realty and Bldg. Co.*, 347 S.W.2d 131 (Mo.1961), the Court, while denying recovery to the third party beneficiary before it, did recognize that " 'in a proper case' third persons, for whose benefit or protection a contract has been made by a municipal corporation with a private contractor, may maintain an action on the contract . . . . It is not necessary that the property owners be named as obligees, the problem is whether the contract and bond were for their benefit and protection." 347 S.W.2d at 134. Moreover, we agree with the statement of the Minnesota Supreme Court in *La Mourea v. Rhude*, 295 N.W. at 307:

"Many cases dealing with recovery by a third party beneficiary have also required and discussed the element of privity as a prerequisite to recovery. . . . Privity, in the law of contracts, is merely the name for a legal relation arising from right and obligation. . . . In short, privity of contract is legal relationship to the contract or its parties. To affirm one's right under a contract is therefore to affirm his privity with the party liable to him."

*See also, J. A. Tobin Constr. Co.*, 536 S.W.2d at 884, in which privity is not even considered as a bar to recovery. In light of the rule stated in these cases, *Howsmon* is not dispositive of this question.

Kaw Valley also cited *Uhrich v. Globe Surety Co. of Kansas City*, 191 Mo.App. 111,

166 S.W. 845 (1914), in which the court held that a materialman could not recover as a third party beneficiary under a contract bond given by the contractor to the owner of the property. This holding was considered at length in *La Salle Iron Works, Inc. v. Largen,* 410 S.W.2d 87 (Mo. banc 1966), in which this court held a materialman could recover. Although *La Salle* distinguished *Uhrich* on the basis of a provision in the *La Salle* bond providing for payment of those who had contracts for labor or materials with the principal, it overruled *Uhrich* to the extent it was contrary to the more liberal view expressed in *La Salle.* *La Salle* cited with approval *Freigy v. Gargaro,* 223 Ind. 342, 60 N.E.2d at 292 which allowed third party claims. The terms of the contract in this case manifest an intent to make injured property owners, third party beneficiaries thereof. No further evidence of intent is necessary under *La Salle Iron Works, Inc.,* 410 S.W.2d at 92. Cases from other jurisdictions, relied upon by Kaw Valley, are of comparable vintage to *Howsmon, see e. g., Gay v. Engebretsen,* 158 Cal. 21, 109 P. 876 (1910); *Inge v. Board of Public Works of Mobile,* 135 Ala. 187, 33 So. 678 (1903); *Blochman v. Sprecklels,* 135 Cal. 662, 67 P. 1061 (1902). Basically, these cases hold that a city has no authority to contract to have the contractor assume any liability except for his own negligence, on the theory that he will charge more to cover this additional risk and thus put the city, and hence the taxpayers, to additional expense. We have implicitly rejected this theory in *J. A. Tobin Constr. Co.,* 536 S.W.2d at 884, by approving § 145 of the Restatement of Contracts, in *Frank Miceli & Sons Realty & Bldg. Co.,* 347 S.W.2d at 134, and in *La Salle Iron Works, Inc.,* 410 S.W.2d at 92. A city plainly has the right to weigh the additional cost inherent in such a provision in the contract

against the possible cost to its citizens should they suffer the potential damages presented by the project.

■ Having determined that the Power Company can sue as a third party beneficiary, the question arises whether it can sue for all damages incurred regardless of their source. It is clear from the terms of the contract set out above that liability for damages caused by the contractor's own negligence (for which he would be liable even absent the contract), and for damages due to conditions not foreseeable or not due to anyone's negligence, are covered, *see* GC–28, *supra.* However, Kaw Valley alleges that it did not agree to be responsible for damages caused by the negligence of the city. In support, Kaw Valley cites numerous cases holding that one party to a contract will not be held to have contracted to indemnify a second party to a contract against the latter's own negligence absent a contract provision *explicitly* so requiring. In *J. A. Tobin Constr. Co.,* 536 S.W.2d at 884–85, this principle was applied to third party beneficiary contracts. The court held that where the negligence of the third party beneficiary was itself the cause of its own damages, the contractor would not be held to have assumed liability for such damages.

Such principles have no application to this case, however. First, there is no question of indemnity involved here. The contract provisions do not provide that Kaw Valley will indemnify the city for any damages caused, except as to damages caused by Kaw Valley's own negligence.[4] The contract merely makes Kaw Valley responsible for protecting and repairing adjoining property, in addition to any responsibility the city might bear.

Second, even if this were an indemnity case, the principle which the cited cases

---

4. GC–46 provided: *"DEFENSE OF SUITS.* In case any action in court is brought against the Owner or Engineer, or any officer or agent of either of them, for the *failure, omission, or neglect of the Contractor* to perform any of the covenants, acts, matters, or things by this contract undertaken; or for injury or damage caused by the alleged negligence of the

Contractor or his subcontractors or his or their agents, or in connection with any claim based on lawful demands of subcontractors, workmen, material men, or suppliers; the Contractor shall indemnify and save harmless the Owner and Engineer and their officers and agents, from all losses, damages, costs, expenses, judgments, or decrees arising out of such action."

support is that the Power Company could not collect for damages caused by its own negligence absent more explicit terms than those contained in the contract in question. However, the trial court found that it was the city and not the Power Company that was negligent. Thus, the question we must determine is whether by its contract Kaw Valley assumed responsibility for damages caused by the city.

Most of the cases which have discussed liability to a third party beneficiary under a contract have dealt with damage caused either by employees of the contractor or by some party or condition not set out in the opinion, and thus do not directly aid this inquiry. However, in *Anderson v. Rexroad*, 178 Kan. 227, 284 P.2d 1077 (Kan. 1955), the court was presented with a similar question. On the first appeal of that case, 175 Kan. 676, 266 P.2d 320, 324–25, the court determined, as discussed *supra*, that the contractor had assumed a contractual duty toward the injured property owner. On remand, the contractor amended his answer to claim that the fire which destroyed plaintiff's home resulted from negligence of a third party, the gas company, which had negligently supplied the contractor with a map of its utility lines that did not show the existence of the line severed by the contractor's employee. On appeal, the Kansas Supreme Court held that since the suit was on the contract and the defense alleged was in tort, the "defenses attempted to be pleaded by these paragraphs of the answer do not constitute a defense to the action. More than that, the Kansas City Power and Light Company is not a party to this action and any complaint which defendants have against that company cannot be litigated in this case." 284 P.2d at 1080. In other words, the source of the negligence was immaterial. The question to be resolved was whether, by contract, a duty had been assumed, and whether damages for breach of contract were proper. *Cf. Congregation Rodeph Sholom v. Bradley Constr. Co.*, 165 N.Y.S. at 508 (suit is not for damages but for breach of the contract to repair and replace).

As discussed above, language similar to the contract terms involved here has been construed to impose liability for damages in other cases. In this case, Kaw Valley contracted not only to "be accountable for any damages resulting from his operations" [GC–21] and for "any damages to existing structures, work or materials, because of his operations" [SC–21], but also to be "fully responsible for the protection of all persons . . . and all public and private property including structures, sewers and utilities . . . ." [GC–21]; to "protect all existing structures and property from damage and shall provide bracing, shoring, or other work necessary for such protection" [SC–21]; to sustain and bear any cost and expense due to "all loss or damage arising out of the nature of the work, or from the action of the elements, or from . . . ground water, or from any unusual obstruction or difficulty, or any other natural or existing circumstance either known or unforeseen, which may be encountered in the prosecution of the work" [GC–28]; to restore all "curbs, walks, buildings, . . . and other surface structures affected by construction operations" to their original condition using new materials for any replacements" [SC–14]; and to "repair or replace any damaged structures, work or materials" [SC–21].

The contract language is very broad indeed. No exclusion is made in its seemingly all-inclusive terms for negligence of third parties. We conclude that by this contract Kaw Valley assumed the contractual duty to protect existing property and structures, and to repair or replace any property nonetheless damaged.

The trial court held that Kaw Valley had complied with all the general and special conditions of the contract. Kaw Valley contends that to hold it liable in the face of this finding would be to hold it liable for breach of a contract it did not breach. However, the evidence showed that Kaw Valley did not repair or replace the damaged property belonging to the Power Company. As discussed. *supra*, under the terms of its contract it was required to do so. The circuit court's finding that Kaw Valley had

complied with the contract terms depended on its finding that Kaw Valley owed no such duty and in this regard is an incorrect conclusion of law. Insofar as the circuit court merely meant that Kaw Valley was not negligent and had followed the city's plans and specifications as to where and how to build the tunnel, the finding stands.[5]

Respondent's argument that the contractor, in any event, would be entitled to the benefit of the city's cloak of governmental immunity is answered by the holding above that the city is not entitled in this case to the benefit of that doctrine. The Power Company was entitled to recover against Kaw Valley as a third party beneficiary of the contract between the city and Kaw Valley.

The question remains as to the measure of damages to which the Power Company is entitled against Kaw Valley and the city. Except as to the Chesmore Building, the Power Company showed only the cost of repairing or replacing its property.

The Power Company claims that, regardless of the standard of damages usually applied, where the parties to a contract set the measure of damages for its breach, this agreement will normally be enforced, citing 25 C.J.S. *Damages* § 74, at 852 (1966). It cites SC–14, requiring that damaged property be replaced with new materials, and SC–21, requiring repair or replacement "at no additional cost to Owner." It says it is the "Owner" referred to. However, GC–2 defines "Owner" as the city, not the property owner. That the city is the "owner" for the purposes of the contract, however, does not change Kaw Valley's contractual obligations to the Power Company. In GC–21, Kaw Valley agreed to be "accountable for any damages" resulting from its operations and be "fully responsible for the protection of . . . private property including structures, sewers and utilities above and

below the ground." In GC–28, Kaw Valley agreed to sustain and bear "[a]ll loss or damage arising out of the nature of the work . . ." In SC–14, Kaw Valley agreed to "restore to their original condition" buildings and surface structures damaged by the construction work under the contract. And in SC–21, Kaw Valley specifically agreed to "repair or replace any damaged structures, work or materials . . ." Kaw Valley is liable by the terms of its contract, therefore, for the cost of repairing and replacing the Power Company's damaged property.

■ The cost of razing the Chesmore Building should be included in the cost of repair and replacement. Kaw Valley's argument that only diminution in value should be considered must fail in regard to the Chesmore Building as it has for the Power Company's other damages. The cost of "repair" of the building is more than just its face value of $18,000 before demolition, however. One of the "damages" resulting from the tunneling was the need to demolish the building, a procedure which cost the Power Company $12,000. Kaw Valley, had it complied with the contract, would have been required to pay this amount; it should not benefit because its failure to comply with the contract forced the Power Company to take action on its own. In order to put the Power Company in the position it would have been in had Kaw Valley performed its contract duties, the Power Company must be permitted the cost of razing the building.

■ The Power Company has also appealed the failure of the trial court to award it damages for the razing of the Chesmore Building in its judgment against the city on Count II. The trial court found that since the land on which the building was located had been purchased for and

---

5. This may be all the circuit court meant by its finding. During his testimony, Captain Endebrock, director of Public Works of the city, identified exhibits which stated that Kaw Valley had complied with the plans and specifications for the tunnel. However, upon questioning, Captain Endebrock stated that these exhibits simply meant that the tunnel had been satisfactorily completed, and the end result was acceptable. When asked if it was his intention to say in these exhibits whether or not the contract required the contractor to take care of damages to third parties, the witness answered no.

was being held for future use, the cost of demolition should not be considered as a part of the damages. However, there was no evidence that the Power Company had planned to demolish the building in the near future. The building had been acquired many years previously and was occupied by tenant Chesmore Seed Company. We do not think that speculation as to an intent to replace the building sometime in the near future can be used to deny the Power Company the very real cost it incurred in razing the building.

The city, too, contends that the measure of damages for tortious injury to property is the diminution in value of the property before and after damage. However, prior to the damage the plaintiff possessed a building valued at $18,000. After the damage, the plaintiff possessed a building worth not $0.00, but—$12,000.00. That is, the building was not only of no value to plaintiff, but required an expenditure of $12,000 before the land could be put to an economic use. We have found only one case which mentions the cost of demolition, *Kosco v. Hachmeister, Inc.*, 396 Pa. 288, 152 A.2d 673 (1959). It allowed recovery in tort for this cost, without discussion, as a part of a recovery for the value of the building before the damage occurred. We think that this ruling has merit, and conclude that the Power Company was entitled to have included in its damages against the city for the latter's negligence the cost of razing the building. We note, of course, that the Power Company will be entitled to collect only once for these damages, as well as for any other damages for which the awards against the city and Kaw Valley overlap.

The Power Company contends that the trial court erred in sustaining the Water Company's motion for judgment at the close of all of the evidence, both because it made a submissible case against the Water Company under the res ipsa loquitur doctrine and because the trial court's action was against the weight of the evidence and supported by no substantial evidence. The res ipsa loquitur doctrine applies, as the Power Company notes, when the plaintiff's

pleading shows that the occurrence resulting in injury would not normally happen if due care were used, when the instrumentalities involved are within the management and control of defendant, and when defendant possesses superior knowledge as to the occurrence. *See, e. g. Sansone v. National Food Stores, Inc.*, 352 S.W.2d 375, 377 (Mo. App.1961); *McClosky v. Koplar*, 329 Mo. 527, 46 S.W.2d 557, 559 (Mo. banc 1932). Here, however, plaintiff has failed to identify the instrumentality that caused the damage as being within the control of the defendant. That is, if the Power Company had shown that the Water Company's mains had leaked, that these leaks had caused the accident, and that the mains were in the company's control and it possessed superior information as to the cause of the leak, a res ipsa case would be found. The defendant could then rebut this evidence with proof of another cause of the injury. In the instant case there was evidence not only of leakage of the water mains, but of other possible sources of underground water, such as rainfall and the nearby presence of the Missouri River. In other words, while there was evidence from which the trial court *could* have found that the leaks were the source of the large amounts of water found, there was also ample evidence of other sources of water which negated the "control" element necessary for a res ipsa loquitur case. The trial court considered the evidence and apparently determined that the river or the rain was the source of the water, since it found the city negligent in not testing and discovering the water's presence. This finding was not against the weight of evidence.

In the city's appeal from the dismissal of its cross-claim against Kaw Valley, it argues that the contract provisions make Kaw Valley liable for the damages sustained by the Power Company. We have so held. However the fact that Kaw Valley might be liable to the Power Company does not require that the city's claim against Kaw Valley be sustained. As has been stated, the city's liability was based upon its negligence in failing to make ade-

quate soil tests for the project. No provision of the contract has been cited whereby Kaw Valley assumed to protect the city against liability for the city's negligence. Therefore, the dismissal of the cross-claim was not error.

The city also seeks reversal of the dismissal of its third party action against Black and Veatch. In its reply brief on the issue, the city states that its theory of recovery against Black and Veatch is for breach of their contract with the city in that they failed to obtain strict compliance by Kaw Valley with the terms of its contract and failed to draw adequate plans and specifications as required by the contract between the city and Black and Veatch. The city states that the measure of damages for the breach is the amount of the award against the city.

 The trial court found that Kaw Valley had complied with all the general and special conditions of its contract with the city.[6] If there was a deficiency in the plans and specifications, the basic fault lies with the city's failure to provide the soil tests, the responsibility of the city under the contract with Black and Veatch. In its reply brief, the city questions for the first time the evidentiary support for the trial court's finding that the city failed to make soil tests. The right to raise such issue in a reply brief is questionable. *See* Cf. *Denney v. Spot Martin, Inc.*, 328 S.W.2d 399, 405 (Mo.App.1959). However, there was evidence that, after the project shut down for several months in September 1971, the city engineer sought funds from the city council for subsurface investigation north of Second and Edmonds Streets. The funds were denied and no such investigation was undertaken by the city. From this evidence, the court could infer that no adequate investigation was made.

The judgment of the trial court in favor of Kaw Valley Tunneling, Inc., and I. V.

Cunningham, Sr., joint venturers, on Count III of the petition of St. Joseph Power and Light Company is reversed, as is its judgment denying the Power Company damages against the city of St. Joseph on Count II of its petition for the razing of the Chesmore Building and the cause remanded for further proceedings consistent herewith. The judgment is affirmed in all other respects.

Affirmed in part; reversed and remanded in part.

BARDGETT, C. J., and DONNELLY, RENDLEN, WELLIVER and MORGAN, JJ. concur.

HIGGINS, J., not participating because not a member of the court when cause was submitted.

---

6. As noted, *supra*, the trial court erroneously concluded that Kaw Valley had no obligation to protect or repair the Power Company's property, and hence that it had fully complied with the contract. We have reversed the first ruling, and hence also the conclusion that Kaw Valley complied with all provisions, since it did not in fact repair or replace damaged property. This does not affect the trial court's finding that Kaw Valley complied with the contract in all other respects, however, including compliance with the city's plans and specifications.