James BABB, et al., Respondents,

v.

MISSOURI PUBLIC SERVICE COMMISSION, et al., Respondent.

City of Clarkson Valley, Missouri, Scott Douglass, James Meyer, Lyn Midyett, Honora Schiller, Susan Shea, Scott Schultz, and Wendell Sittser, Appellants.

No. WD 76384.

Missouri Court of Appeals, Western District.

Nov. 26, 2013.

Shelley E. Brueggemann and Joshua Harden, Jefferson City, MO, for respondent Missouri Public Service Commission.

Stephen G. Jeffery, Chesterfield, MO, for respondents Babb, et al.

John F. Mulligan, Jr., Clayton, MO, for appellants.

Before Division Three: KAREN KING MITCHELL, Presiding Judge, LISA WHITE HARDWICK, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

## INTRODUCTION

The Board of Aldermann ("Board") for Clarkson Valley, Missouri ("City," collectively including the Board), denied the ap-

plication of James and Frances Babb ("the Babbs") for a Special Use Permit ("SUP") for the installation of a solar energy system ("system") on their home. The Board denied the Babbs' application based on an ordinance addressing solar energy systems. The Babbs, along with the Missouri Solar Energy Industries Association ("MOSEIA"), filed suit alleging *inter alia* that the City's ordinance was preempted by the State's permissive regulations on renewable energy, specifically the "Electric Utility Renewable Energy Standard Requirements," 4 CSR 240–20.100.[1] The Babbs also alleged that their application for a SUP had been arbitrarily and capriciously denied. The trial court granted partial summary judgment to both petitioners, based upon a finding that the City's ordinance regulating the grant of an SUP to the Babbs was preempted by the State's statutes and regulations and the ordinance was thus void. The trial court also granted partial summary judgment to the Babbs finding that the City's denial of the SUP was arbitrary and capricious. The court ordered the City to issue a permit within one day of the court's order, and failing to do so, ordered that construction may begin without a permit. Additional counts of the petition remained pending. Without waiting until the judgment became final, the Babbs constructed the system. Later, the Babbs dismissed their remaining claims and received an appealable final judgment. This appeal by the City follows.

In its five points on appeal, the City argues that the trial court erred in granting summary judgment because (1) the City's building ordinances do not actually conflict with the State's statutes and regulations; (2) the Babbs' petition failed to

---

1. All regulation references are to the Missouri Code of State Regulations as currently updat- ed unless otherwise indicated.

state a claim upon which relief can be granted; (3) the Babbs' petition was filed more than thirty days after the administrative decision of the Board, which is prohibited by section 89.110; [2] (4) MOSEIA's petition failed to state a claim upon which relief can be granted; and, alternatively argues (5) that the court erred in entering its final judgment on the original petition and not on the Babbs' first amended petition.

We affirm.

### Factual and Procedural Background [3]

In November of 2008, pursuant to an initiative petition, the voters of Missouri adopted Proposition C, the Missouri Clean Energy Initiative, which adopted, among other provisions the "Renewable Energy Standard" found in sections 393.1020–393.1030. Proposition C mandated that 15 percent of the electricity produced by Missouri investor-owned utilities come from renewable energy sources by the year 2021, with 2 percent of that coming from solar photovoltaics.[4] Pursuant to Proposition C, the Public Service Commission ("PSC") in conjunction with the Department of Natural Resources ("DNR") adopted regulations regarding renewable energy sources. § 393.1025. Two regulations govern various aspects of how Missouri residents can utilize renewable energy, including solar, wind and other listed forms of renewable energy: 4 CSR 240–20.065 and 4 CSR 240–20.100. One governs how renewable energy systems are to be designed and approved for use. 4 CSR 240–20.065. The other governs how residents and electric utilities are able to receive credits on their electricity bills and Renewable Energy Tax Credits ("RECs") through the operation of "customer-generator facilities and acquired by the Missouri electric utility." 4 CSR 240–20.100(2)(B)3.

After the passage of Proposition C, the Babbs began working on a plan to install a solar energy power system for their home. They completed an extensive application process as outlined in 4 CSR 240–20.065 and submitted it to the PSC and the local investor-owned utility company, Missouri Ameren ("Ameren"). Ameren approved the plan on October 12, 2011. On November 1, 2011, the Babbs submitted an application to the City for a building permit to construct the system.[5] The original plan called for the installation of one hundred solar energy panels on the roof of their home. Although there were other homes that included solar energy panels within the City, the Babbs' plan called for more panels than anyone else had previously constructed. The plan, however, complied with the City's ordinances that were in effect at the time the plan was submitted in that "there were no requirements therein with respect to the installation or operation of solar energy systems at residential single-family dwellings." The same day that the Babbs' application for a building permit was filed, the City imposed a moratorium on the construction of solar energy systems within the City. From the record it is unclear which came first: the filing of

---

**2.** All statutory references are to RSMo 2000 cumulative as currently supplemented unless otherwise indicated.

**3.** When considering an appeal from the grant of summary judgment, we review the record in the light most favorable to the party against whom the judgment was entered. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Co.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

**4.** Photovoltaics employ the use of solar energy panels to produce electricity.

**5.** At the time of Babbs' application for a building permit, the ordinances did not address solar energy systems. Thus, a SUP for the construction of a solar energy system was not required.

the application or the adoption of the moratorium.

On January 3, 2012, while the Babbs' building permit application was pending but the moratorium was in effect, the Board adopted two new ordinances. The first changed the type of permit needed for solar energy systems from a building permit that the City's Planning and Zoning Commission ("P & Z") is authorized to issue, to an SUP that would require the final approval by the Board. *See* section 405.120(B.15). The second ordinance specifically addressed the requirements for installation of solar energy panels on or adjacent to a residence.[6] *See* section 500–M2300. Upon learning that the type of permit required to construct the system had been changed, the Babbs filed an application for an SUP on January 5, 2012. On January 31, 2012, the local fire department, the Monarch Fire Department, approved the plans as required by the ordinance.

On February 3, 2012, the P & Z held a public hearing specifically on the Babbs' SUP application. Following the hearing, pursuant to concerns raised by the P & Z and the public, the Babbs modified the plan to reduce the number of solar panels on the roof of the residence from one hundred to forty-two. In conjunction with lessening the number of rooftop panels, the Babbs agreed to install the remaining panels on stand-alone poles on the ground on their property adjacent to their residence. At the conclusion of the hearing, the P & Z held a vote and it was indicated that the P & Z would recommend the Babbs' plan be approved if the number of

roof-top panels were reduced as had been discussed. The Babbs then submitted a revised plan and revised SUP application consistent with their representations to the P & Z. Subsequently, the P & Z voted to recommend approval of the revised plan and the granting of an SUP. Shortly thereafter, but prior to final determination by the Board, on February 9, 2012, the Babbs signed a contract with Ameren to construct the system.

After the P & Z recommended approving the Babbs' plan, the Board held a meeting at which they reviewed the Babbs' SUP application. The Board voted 6–0 to deny the permit. The Board did not set forth the reasons for that denial.

The Babbs filed suit in the Circuit Court of Cole County alleging that the city ordinance was void by preemption because its proscriptions, as applied, prohibited the building of any rooftop solar energy system as permitted in the regulations and encouraged by the Missouri Renewable Energy Act of 2008. Their three-count petition sought a declaratory judgment against the PSC, the Board and City.[7] Count I sought declaratory judgment that the City ordinance was in conflict with the statute and regulations and therefore void. Count II sought a declaration of vested rights regarding the application they filed for a building permit prior to the amendment to the ordinance regulating solar electric systems. Count III alleged that the City's denial of its SUP was arbitrary, capricious, unreasonable and an abuse of discretion.

6. This ordinance was applicable to any construction of solar energy systems on residential structures, whether or not the system would be connected to an electric utility. The state statute and regulations are only applicable to solar energy systems that are connected to an electric utility.

7. While the City is located in St. Louis County, the Babbs filed their petition in Cole County because an administrative agency of the State, the PSC, was a co-defendant. *See* § 536.050.

One month after filing its petition, the Babbs moved for partial summary judgment on Counts I and III, preemption and abuse of discretion, respectively. On June 29, 2012, the trial court granted partial summary judgment on Counts I and III but did not address Count II. The trial court ordered the City to issue a permit within one day of the court's order, and failing to do so, ordered that construction of the system could commence without a permit.

The City did not issue the permit, so the Babbs began construction without waiting for the judgment to become final. In November 2012, the Babbs completed construction of their solar energy system and also amended their petition, with leave of court. The amended petition contained the same first three counts and added a new count alleging a governmental taking of their property by the failure to grant the building permit and/or SUPs. Thereafter, on January 29, 2013, the Babbs dismissed Counts II and IV and moved for a final judgment based on the prior partial summary judgment. On January 30, 2013, the trial court entered a judgment granting the PSC's motion to dismiss Counts I through IV as failing to state a claim against the PSC. On April 15, 2013, the trial court entered a final judgment that finalized its previous partial summary judgment. The City brings this appeal.

The City alleges that the trial court erred in granting summary judgment because (1) the trial court erroneously concluded as to Count I of the Babbs' petition that the City's ordinance conflicted with state statutes and regulations and was

thus preempted; (2) Count I of the petition failed to state a claim upon which relief could be granted; (3) Count III of the petition was time barred by section 89.110 as it was filed more than thirty days after the administrative decision of the Board denying the SUP application; (4) Count I of the petition failed to state a claim upon which relief could be granted as to MOSEIA; and (5) the final judgment of the court was improperly entered on the original petition and not on the first amended petition.

## Standard of Review

This Court's review of summary judgment is *de novo*. *ITT Commercial Fin. Corp.,* 854 S.W.2d at 376. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* A movant for summary judgment is entitled to summary judgment if the movant can demonstrate, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law. *Id.* at 378.

## Analysis on Point I

■ In Point One, the City argues that the trial court erred in granting summary judgment based on preemption because the ordinances do not conflict with state statutes and regulations.[8] It contends that its ordinances are merely regulatory, not prohibitive, such that there is no actual conflict. We agree.

---

**8.** The City argues that the Babbs' claim fails because the ordinances were not attached to the petition nor were the substance of the ordinances contained within the language of the petition. However, the applicable ordinances upon which the Babbs' claims are based are attached to the Babbs' affidavits

that were filed in support of their motion for summary judgment. The City did not file a counter affidavit on this issue and does not allege that the ordinances attached to the Babbs' affidavits are deficient or fail to properly and fully set forth the proper and applicable ordinances of the City.

"A municipality derives its governmental powers from the state and exercises generally only such governmental functions as are expressly or impliedly granted it by the state." *City of Dellwood v. Twyford,* 912 S.W.2d 58, 59 (Mo. banc 1995) (citation omitted). A municipal ordinance that conflicts with the general law of the state is void. *Id.* (citing *Morrow v. City of Kansas City,* 788 S.W.2d 278, 281 (Mo. banc 1990)). A municipal ordinance must be in harmony with the general law of the state upon the same subject; otherwise, it is void. *Kansas City v. Troutner,* 544 S.W.2d 295, 298 (Mo.App. W.D.1976) (citing *Kansas City v. LaRose,* 524 S.W.2d 112, 116 (Mo. banc 1975)).

The Babbs argue that the state has preempted this area of regulation and therefore the City cannot further regulate solar power systems. "The issue of preemption may fairly be divided into two questions: Has the Missouri legislature expressly preempted the area? And, is the city's regulation in conflict with state law?" *Miller v. City of Town & Country,* 62 S.W.3d 431, 438 (Mo.App. E.D.2001). The Babbs argue that the state statutes and regulations preempt the ordinances because "the ordinances are inconsistent with and present an irreconcilable conflict with what is allowed by the PSC rule." The Babbs do not point to any express language in either the statute or regulation that expressly preempts local ordinances with regard to solar energy systems generated by a utility customer, and in fact the regulations on their face anticipate some authority by local entities to regulate various aspects of the systems. Thus, because there is no express language regarding preemption, we must review to see if the City's ordinance is in conflict with the state statutes and regulations.

To determine if a conflict exists between an ordinance and a state statute, the test is whether the ordinance "permits that which the statute prohibits" or "prohibits that which the statute permits." *Page W., Inc. v. Cmty. Fire Prot. Dist. of St. Louis,* 636 S.W.2d 65, 67 (Mo. banc 1982) (citations omitted). "If a local law either prohibits what state law allows, or allows what state law prohibits, then a local law is in conflict with the state law and, therefore, preempted." *Borron v. Farrenkopf,* 5 S.W.3d 618, 622 (Mo.App. W.D.1999) (citations omitted).

However, while preemption forbids a *conflict* with state law, it does not prohibit *additional regulations* by the locality. *State ex rel. Hewlett v. Womach,* 355 Mo. 486, 196 S.W.2d 809, 815 (1946). "The fact that an ordinance enlarges upon the provisions of a statute by requiring more than the statute requires creates no conflict therewith, unless the statute limits the requirements for all cases to its own prescriptions." *Id.* at 815 (citation omitted). When an ordinance simply adds to the statute, absent express language in the statute prohibiting such additional requirements, the ordinance is valid. *Id.* "If a statute does not specifically grant a right, but is silent on the question, then it may be permissible for the local government to establish prohibitions in that area." *Miller,* 62 S.W.3d at 438. "However, if the expressed or implied provisions of each are inconsistent and irreconcilable then the ordinance is voided or annulled by the state statute." *Combined Commc'ns v. City of Bridgeton,* 939 S.W.2d 460, 463 (Mo.App. E.D.1996).

Neither party questions the validity of the applicable state statute or state regulations. Therefore, we must compare the plain meaning of the applicable statutes and state regulations to the municipal ordinances to determine whether the ordinances are preempted or in conflict.

## A. Statute Governing the Regulations

The state regulations at issue were promulgated under the authority of the Net Metering and Easy Connection Act, codified at section 386.890, which states, in relevant part:

6. (1) Each qualified electric energy generation unit used by a customer-generator shall meet all applicable safety, performance, interconnection, and reliability *standards established by any local code authorities,* the National Electrical Code, the National Electrical Safety Code, the Institute of Electrical and Electronics Engineers, and Underwriters Laboratories for distributed generation. . . .;

7. (1) Applications by a customer-generator for interconnection of a qualified electric energy generation unit meeting the requirements of subdivision (3) of subsection 2 of this section to the distribution system shall be accompanied by the plan for the customer-generator's electrical generating system, including but not limited to a wiring diagram and specifications for the generating unit, and *shall be reviewed and responded to by the retail electric supplier* within thirty days of receipt for systems ten kilowatts or less and within ninety days of receipt for all other systems. . . .

§§ 386.890.6(1)–7(1) (emphasis added).

Notably, the statute requires that the system "meet all applicable safety, performance, interconnection, and reliability standards established by any local *code* authorities" and that the plans be approved by the "retail electric supplier." Other requirements include that the owner obtain various certifications from qualified electricians or engineers as part of the approval process, the details of which are specified in 4 CSR 240–20.065.

## B. Regulations Governing Customer–Generated Solar Energy Systems

Pursuant to the authority of the statute, two applicable state regulations that govern customer-generated solar energy systems have been adopted: 4 CSR 240–20.065 and 4 CSR 240–20.100. The former "establishes standards for interconnection of qualified net metering units . . . with distribution systems of electric utilities." 4 CSR 240–20.065. The latter, enacted two years later, "sets the definitions, structure, operation, and procedures relevant to compliance with the Renewable Energy Standard." 4 CSR 240–20.100. In other words, the first establishes the process of how such systems are to be constructed while the second establishes how those systems can produce energy tax credits and rebates. The latter cross-references the former because the rebate legislation was adopted apparently to encourage the use of such systems.

The regulatory language of both regulations follows that of the statute. The PSC requires that the electric utility to which the private system will attach approve the plans and specifications of each proposed system. The first regulation, 4 CSR 240–20.065, implements the Net Metering and Easy Connection Act (section 386.890) and states, in relevant part, that:

Each qualified electric energy generation unit used by a customer-generator shall meet *all applicable safety, performance, interconnection, and reliability standards established by any local code authorities,* the National Electrical Code, the National Electrical Safety Code, the Institute of Electrical and Electronics Engineers (IEEE), and Underwriters Laboratories (UL) for distributed generation; including, but not limited to, IEEE 1547 and UL 1741.

4 CSR 240–20.065(6)(A) (emphasis added). Additionally,

No consumer shall connect or operate an electric generation unit in parallel phase and synchronization with any electric utility *without written approval by said electric utility* that all of the requirements under subsection (9)(C) of this rule have been met.

4 CSR 240–20–065(6)(C) (emphasis added).

Finally, 4 CSR 240–20.065(9)(C), referenced above, states:

Applications by a customer-generator for interconnection of a qualified electric energy generation unit to the distribution system shall be accompanied by the plan for the customer-generator's electrical generating system including, but not limited to, a wiring diagram and specifications for the generating unit, and *shall be reviewed and responded to by the electric utility* within thirty (30) days of receipt for systems ten kilowatts (10 kW) or less and within ninety (90) days of receipt for all other systems. Prior to the interconnection of the qualified generation unit to the electric utility's system, the customer-generator will furnish the electric utility a certification from a qualified professional electrician or engineer that the installation meets the requirements of subsections (6)(A) and (6)(B).

(Emphasis added.)

The rebate legislation, passed two years later, defines the customer-generator as follows:

Customer-generator means the owner, lessee, or operator of an electric energy generation unit that meets all of the following criteria:

1. Is powered by a renewable energy resource;

2. Is located on premises that are owned, operated, leased, or otherwise controlled by the party as retail account holder and which corresponds to the service address for the retail account;

3. Is interconnected and operates in parallel phase and synchronization with an electric utility and has been approved for interconnection by said electric utility; and

4. Meets all applicable safety, performance, interconnection, and reliability standards endorsed by the net metering rule, 4 CSR 240–20.065(1)(C)6 and 4 CSR 240–20.065(1)(C)7.

4 CSR 240–20.100(1)(D) (emphasis added).

The City points to language in one of three definitional sections that indicates a customer-generator system should meet "all applicable safety, performance, interconnection and reliability standards established by ... *any local governing authorities.*" 4 CSR 240–20.065(1)(C)6 (emphasis added). The City contends that this is a clear affirmation of its police power and argues that the statutory and regulatory schemes "expressly permit" the City to impose its own building and zoning code onto all customer-generated energy systems in addition to their regulation by the State. While this language does give some support for the City's position, we still must review the ordinance to see if it conflicts with the provisions of the statutes and regulations.

## C. Local Ordinance Adds Prohibitive Restrictions

A portion of the new ordinance, section 500.020–M2300, "Solar Energy Systems," of the municipal code provides, in relevant part, that:

C.2. Roof Mounted Solar Energy Systems shall be parallel to the plain [sic] of the roof and shall not extend more than six inches above the roof surface.

C.3. A roof mounted system shall terminate at least three feet from the edge

or ridge of the roof and one and one half feet from any valley.

In addition to these design specifications, the ordinance contains three pages of "General Requirements" for solar energy systems that describe an approval process by the Board that consists of, *inter alia:* obtaining additional certifications from different organizations not required by the statute; the imposition of additional requirements concerning the allowable locations of "dc conductors" not set forth in the statute; a requirement that the "designer" of the system supervise the installation or personally install the system, a requirement not found in the statute; the required use of "non-glare material" on the PV panels and the frames and supports to be of minimally reflective material, provisions not addressed by the statute; and the commissioning of a structural analysis done by either a "Missouri Registered Engineer or an Architect." While all of these are additional requirements, the Babbs point to no provisions that specifically conflict with the statutes or regulations. While it may be that some of these provisions either individually or in concert may be "inconsistent and irreconcilable" with the requirements of the statutes or the regulations in practical application,[9] the motion for partial summary judgment failed to show how they were in conflict and therefore the grant of partial summary judgment on these grounds was in error.

The City further contends that the "trial court's judgment creates two standards for identical solar energy systems"—those under contract with an electric utility, which are regulated by the State and those that are not under contract with an electric utility and therefore are not regulated by the state. It further argues that its ordinances are applicable to all solar energy systems in its city, and are not merely meant to "regulate electric utility retail account holder rebates for solar energy systems or the Babbs' eligibility to obtain them."

The City's ordinance requires similar, if not identical, electrical and engineering certifications for the systems as are required under the statute. § 500.020–M2300(F)(2). The ordinance also requires that the customer's "grid systems shall comply with the requirements of the local utility having jurisdiction and be approved by a recognized third party testing agency." § 500.020–M2300(F)(11). While this duplicates what 4 CSR 240–20.065 requires, which applies to solar energy systems connected to a local electrical grid, it may be necessary to address those systems constructed in the City that are not covered by the State's regulations.

In essence, the City established an application process for its residents, which appears on its face to be consistent with the state statutes and regulations. Section 71.010 states that any municipality in Missouri "shall confine and restrict its jurisdiction and the passage of its ordinances to and in conformity with the state law upon the same subject." Certainly there are additional requirements that these systems must meet to comply with the City ordinance. The Babbs have not established that the ordinance and statutes are in conflict or that the additional requirements of the ordinance make the construction of such a system within the City impossible or unreasonably restrictive, such that the ordinance in application keeps any such system from reasonably being located any-

9. The issue of whether the ordinance as applied effectively preempts state law through inconsistent and irreconcilable regulations that make compliance virtually impossible is not properly before this court.

where within the City, therefore making the ordinance inconsistent and irreconcilable with the state statutes and regulations.

"Local regulations may exceed state requirements, so long as they do not prohibit what state law permits." *Borron*, 5 S.W.3d at 623 (citations omitted). A city "may only enact ordinances 'in conformity' with state law on the same subject." *City of Kansas City v. Carlson*, 292 S.W.3d 368, 371 (Mo.App. W.D.2009). However, while the State may have no concern and therefore have no restrictions regarding the use of reflective materials that shine bright sunlight into a neighbor's window, or the way the solar panels may appear from the street or a neighboring property so as to devalue neighboring property, these are clearly areas of great concern to the City and the citizens thereof. These types of restrictions are within the police powers of the City.

We find that the trial court's grant of summary judgment to the Babbs and MOSEIA on Count I of the petition was error. Point One is granted. However, remand is not required, in light of our disposition of Point Three, discussed *infra*.

Because we find error in the grant of summary judgment on Point One, we do not address the other allegations of error regarding the grant of summary judgment that are asserted in Points Two and Four. However, to determine the disposition of the appeal, we address Points Three and Five.

## Analysis on Point III

■ In Point Three, the City argues that the trial court erred in granting summary judgment in favor of the Babbs on Count III [10] of their petition because the Babbs' request for review of the City's denial of their SUP application was sought under the wrong statute and was thus untimely. The City contends that the Babbs were required to seek review of the City's denial in the circuit court under section 89.110 and that they missed the statutory thirty-day filing deadline for doing so. The City argues that section 89.110 requires review from all zoning decisions to be taken pursuant to its terms, even if the zoning decision is made by an entity other than a Board of [Zoning] Adjustment ("BZA").[11]

Here, the Babbs sought review in the circuit court under section 536.150, and did not file their petition until forty-one days after the City's denial of the SUP application. The City's argument exposes a subject matter that has been unnecessarily confused by earlier appellate opinions, and is ripe for resolution; to wit, whether a zoning decision made by an entity other than a BZA remains under 89.110 for review. We conclude that it does not.

Our role in construing a statute is to read the statute in accordance with its plain and ordinary language. *State ex rel. Union Elec. Co. v. Pub. Svc. Comm'n*, 399 S.W.3d 467, 480 (Mo.App. W.D.2013) (citing *Parktown Imports, Inc. v. Audi of Am., Inc.*, 278 S.W.3d 670, 672 (Mo. banc 2009)). Section 89.110 addresses the pro-

10. Count III of the Babbs' petition effectively assumed the lawfulness of the City's ordinance, and thus alternatively pled that the City's denial of their SUP application was arbitrary and capricious. Count III thus complains about the City's administrative versus legislative function. *See Furlong Cos., Inc. v. City of Kansas City*, 189 S.W.3d 157,

164 (Mo. banc 2006) (holding that when a city body proceeds under an ordinance, it is "acting in an administrative capacity and not in a legislative capacity").

11. Boards of Adjustment are also commonly referred to as Boards of Zoning Adjustment, or BZAs.

cedure for review of "boards of adjustment." It provides, in pertinent part, that:

> Any person or persons jointly or severally *aggrieved by any decision of the board of adjustment,* any neighborhood organization as defined in section 32.105, RSMo, representing such person or persons or any officer, department, board or bureau of the municipality, may present to the circuit court of the county or city in which the property affected is located a petition, duly verified, setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality. Such petition shall be presented to the court *within thirty days after the filing of the decision in the office of the board.* Upon the presentation of such petition the court may allow a writ of certiorari *directed to the board of adjustment to review such decision of the board of adjustment* . . . .

(Emphases added).

The plain and ordinary language of section 89.110 is limited to "decisions of the board of adjustment." The "board of adjustment" is defined by chapter 89.080, requiring us to employ the legislature's definition in construing section 89.110. *Union Elec. Co.,* 399 S.W.3d at 480 (citing *Goerlitz v. City of Maryville,* 333 S.W.3d 450, 455 (Mo. banc 2011)). In determining the legislature's intent, we review the statute in the context of the entire statutory scheme on the same subject. *Short v. S. Union Co.,* 372 S.W.3d 520, 535 (Mo.App. W.D.2012) (internal citation omitted).[12] Read in context with the other provisions of Chapter 89, it is plain and unambiguous that the requirement of seeking writ of certiorari review applies only to "board of adjustment" decisions.

The Eastern District of this court recognized precisely this point in *Lorenz v. City of Florissant,* 747 S.W.2d 222 (Mo.App. E.D.1988). In *Lorenz,* a city council denied a homeowner's request for a variance from a zoning restriction affecting the ability to install vinyl siding. *Id.* at 223. The homeowner filed a request for review of the decision pursuant to section 536.100 of the Administrative Procedures Act. *Id.* at 224. The appellate court rejected the argument that the aggrieved homeowner was required to seek writ of certiorari review pursuant to section 89.110, noting that the latter statute applied only to decisions of BZAs, not to city council decisions. *Id.* The court further observed that "[m]any zoning type cases have been reviewed pursuant to Chapter 536 RSMo ... involv[ing] the administrative review of decisions regarding SUPs, conditional use permits, or building permits." *Id.* (citations omitted).

We agree with the rationale in *Lorenz.* The plain language of section 89.110 is unambiguously limited to actions by BZAs. Correspondingly, the plain language of 536.150 provides for judicial review in relevant part as follows:

> When any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance shall have rendered a decision which is not subject to administrative review, determining the legal rights, duties or privileges of any person, include the denial or revocation of a license, and there is no other provision for judicial inquiry into or review of such

---

**12.** For example, section 89.100 describes the categories of those eligible to take an appeal *to* a board of adjustment. Correspondingly, section 89.110 describes the categories of those eligible to seek writ of certiorari review *from* decisions of a board of adjustment. The categories are the same under both statutes and include: (i) person or persons aggrieved; (ii) neighborhood organizations representing such person or person aggrieved; (iii) or any officer, department, board or bureau of the municipality aggrieved.

decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action ... and the court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion.

Our Supreme Court has found this section applicable when circuit court review is sought from non-contested administrative decisions. In *Furlong Cos., Inc. v. City of Kansas City*, 189 S.W.3d 157, 164–67 (Mo. banc 2006), the Supreme Court found that review of a city's decision to deny an application for approval of a subdivision plat was a non-contested administrative decision reviewable under section 536.150. Here, the trial court found that the City's denial of the Babbs' SUP application was a non-contested decision, a finding not challenged by the City on appeal.

The City correctly points out that several opinions have been issued by Missouri appellate courts since *Lorenz* holding that section 89.110 is applicable to all zoning decisions, whether or not made by a BZA.[13] We respectfully disagree with these decisions, each of which concludes, without analysis or resort to required rules of statutory interpretation or construction, that since section 89.110 is a more specific judicial review statute than that outlined in chapter 536, it should be applicable to all zoning decisions. However, the plain and unambiguous language of section 89.110 limits its application to decisions made by BZAs and does not support this conclusion.[14]

Here, the Babbs filed Count III of their petition requesting a declaration that denial of their SUP application was arbitrary and capricious. They filed this count of their petition pursuant to section 536.150.

■ The City's decision to deny the SUP application was not made by a "board

---

13. See, e.g., *DeBold v. City of Ellisville*, 2013 WL 4604198, *2–3 (Mo.App. E.D. August 30, 2013); *State ex rel. Presbyterian Church of Washington, Mo. v. City of Washington*, 911 S.W.2d 697, 700 (Mo.App. E.D.1995) ("The judicial review of a zoning and planning decision by a municipal agency is provided by Section 89.110, and so controls"); *Deffenbaugh Indus., Inc. v. Potts*, 802 S.W.2d 520, 524 (Mo.App. W.D.1990); *Village Lutheran Church v. City of Ladue*, 935 S.W.2d 720, 722 (Mo.App. E.D.1996); *Platte Woods United Methodist Church v. City of Platte Woods*, 935 S.W.2d 735, 738 (Mo.App. W.D.1996); *Chaminade College Preparatory, Inc. v. City of Creve Coeur*, 956 S.W.2d 440, 442 (Mo.App. E.D. 1997); *Nigh v. City of Savannah*, 956 S.W.2d 451, 453 (Mo.App. W.D.1997); *State ex rel. Gannett Outdoor Co. of Kansas City v. City of Lee's Summit*, 957 S.W.2d 416, 418–19 (Mo. App. W.D.1997); *State ex rel. Jackson v. City of Joplin*, 300 S.W.3d 531, 534–35 (Mo.App. S.D.2009); *State ex rel. Karsch v. Camden Cnty.*, 302 S.W.3d 754, 756 (Mo.App. S.D. 2010).

14. Interestingly, treatises and law review articles on section 89.110 suggest that some Mis-

souri opinions have mistakenly read the phrase "any officer, department, board or bureau of the municipality" in section 89.110 to refer to additional decision making bodies whose decisions must be reviewed pursuant to section 89.110. See, e.g., MISSOURI LAND USE LAW AND PRACTICE, Michael T. White, Vol. 2, section 11.39; Albert A. Michenfelder, Jr., *Practitioner's Dilemma: Judicial Review Under Section 536.100, RSMo or Section 89.110 RSMo?*, 54 J. OF MO. BAR 147, 149 (1998). These resources correctly point out, however, that the phrase "refer[s] to a party who is aggrieved and who may take an appeal rather than who made the decision below." White, *supra*.

Any doubt in that regard is erased by reviewing section 89.100 which provides that appeals to the board of adjustment may be taken "by any person aggrieved or by an officer, department, board or bureau of the municipality affected by any decision of the administrative officer" and by the fact that the writ prescribed in section 89.110 is directed "to the board of adjustment." *Id.*

of adjustment," specifically defined and authorized by section 89.080.[15] The decision to deny the Babbs' SUP application was made by the City's Board of Alderman via a process that facially did not comport with the statutory provisions addressing "boards of adjustment."[16] Thus, the City's denial of the Babbs' SUP application immediately falls outside the purview of section 89.110 and into the purview of chapter 536. We thus conclude that section 89.110 has no application to Count III of the Babbs' petition, and that the Babbs correctly sought review of the City's decision to deny their SUP application pursuant to section 536.150.[17] Section 536.150 does not set forth a thirty-day deadline within which review must be sought from a non-contested administrative decision. Thus, Count III of the Babbs' petition was both timely and filed pursuant to the proper statutory authority. In holding that section 89.110 has no application to zoning decisions unless made by a BZA, we decline to follow the authorities listed in footnote thirteen, *supra.*

We therefore conclude that the trial court did not error in entering summary judgment in favor of the Babbs on Count III of their petition. Except to quarrel with whether Count III was filed under the wrong statute and thus was time barred, the City has not otherwise appealed the trial court's conclusion that the denial of the Babbs' SUP application was arbitrary and capricious. As such, the trial court's judgment in favor of the Babbs on Count III of their petition is affirmed. Point Three is denied.

## Analysis on Point V

As an alternative to the arguments raised in the previous four points, in Point Five the City contends that the trial court erred in entering its final judgment because it did so on a superseded petition. As noted above, the trial court entered a partial summary judgment on June 29, 2012, the Babbs filed a first-amended petition on November 19, 2012, and the court entered a final judgment on April 15, 2013, disposing of all claims.

15. A "board of adjustment" is defined by section 89.080 as a five member board appointed by the "local legislative body" pursuant to legislatively proscribed terms and who must meet in accordance with statutorily authorized rules to conduct business as described in section 89.090. That business includes hearing appeals from decisions made by an administrative official in the enforcement of Chapter 89 zoning statutes.

16. Here, the Board of Alderman was not entertaining an "appeal" from action taken by the P & Z on the Babbs' SUP application. The P & Z made no decision about the application from which an appeal could be taken, and merely recommended approval of the application—a "decision" that has no practical binding effect under the City's ordinances on any party. Thus, the Board of Alderman acted as the sole decision maker on the Babbs' SUP application, eliminating any argument that it was acting, tacitly, as a BZA in acting upon the SUP application.

17. We note, for the sake of clarity, that the City does not argue in its third point relied on that the Babbs' preemption argument in Count I of their petition should have been initiated under section 89.110 and not section 536.150. That is no doubt because the City recognizes that "[s]tatutory review by writ of certiorari is unavailable when the aggrieved party is challenging the validity of an ordinance." *Normandy Sch. Dist. v. City of Pasadena Hills,* 70 S.W.3d 488, 492 (Mo.App. E.D. 2002); *see also State ex rel. Drury Displays, Inc. v. City of Columbia,* 907 S.W.2d 252, 255 (Mo.App. W.D.1995) ("[a] challenge to the validity of an ordinance is a challenge of an exercise of a legislative function, and certiorari does not lie to review the exercise of legislative power") (citation omitted). Thus, Count I of the petition was properly initiated pursuant to section 536.150.

 "As a general rule, 'an amendment to a pleading abandons any prior pleadings not referred to or incorporated into the new pleading.'" *Value Lumber v. Jelten,* 175 S.W.3d 708, 713 (Mo.App. S.D. 2005) (citation omitted). *See also Beckmann v. Miceli Homes, Inc.,* 45 S.W.3d 533, 544 (Mo.App. E.D.2001) (claims disposed of in interlocutory default judgment were abandoned where plaintiff neglected to reassert claims in amended petition); *State ex rel. Bugg v. Roper,* 179 S.W.3d 893, 894 (Mo. banc 2005) (holding that once an amended pleading is filed, any prior pleadings not referred to or incorporated into the new pleading are considered abandoned).

Here, the Babbs' first amended petition specifically incorporated and referenced the claims ruled on by the trial court's grant of partial summary judgment. In paragraph twenty-four, the Babbs reference the court's summary judgment order and note that it ruled in their favor on Counts I and III. The Babbs then reiterated Counts I, II and III of their original petition and added Count IV. Thus, following the general rule of Missouri, by reiterating and referencing the claims in their preceding petition, the Babbs did not abandon these claims. Thus, we find no error by the trial court in finalizing its order for partial summary judgment in its final judgment. Point Five is denied.

## PSC's Position as Intervenor–Respondent

 This court granted the PSC's motion to intervene as a respondent. The PSC's amended brief[18] contends that the trial court lacked jurisdiction to review the Babbs' petition because claims involving the interpretation of a regulation promulgated by the PSC must first be originally reviewed by the PSC. It maintains that because the Babbs did not first seek review by the PSC, the trial court lacked jurisdiction to review these claims. We find that the circuit court had jurisdiction over this matter for three reasons. First, there is jurisdiction because the validity of the statute or regulation is not at issue here; rather, it is the validity of a city ordinance as applicable to valid state statutes and valid state regulations that is at issue. No party raises any argument as to the validity or application of the state statutes or regulations. Missouri courts have previously exercised jurisdiction when the validity of an ordinance is questioned. *See generally Patty Sue, Inc. v. Springfield,* 381 S.W.3d 360 (Mo.App. S.D.2012); *Carlson,* 292 S.W.3d 368; *Normandy,* 70 S.W.3d 488.

Second, where an action is filed pursuant to section 536.050, as is the case at bar, a party bringing such an action "shall not be required to exhaust any administrative remedy if the court determines that" it "would result in undue prejudice because the person may suffer irreparable harm if unable to secure immediate judicial consideration of the claim." § 536.050.2(3). "It is just such uncertainty as this that the declaratory judgment provision of Supreme Court Rule 87.02(c) [which is based on section 536.050.1] is designed to settle." *State ex rel. Glendinning Cos. of Conn., Inc. v. Letz,* 591 S.W.2d 92, 98 (Mo.App. W.D.1979). "It enables a person faced with uncertainty of his rights to secure in advance a definitive ruling settling whether a given administrative rule which threatens him is valid and is applicable to his situation or activity." *Id.* Further, one of the primary functions of a declaratory

18. The PSC's first brief was stricken because the position it advocated requested the affirmation of the trial court's ruling and therefore the position taken was not properly that of a respondent.

judgment is to resolve conflicts before a loss occurs. *Foster v. State,* 352 S.W.3d 357, 360 (Mo. banc 2011).

Third, in an action for declaratory judgment, the rendering of such a judgment, if the trial court chooses to grant it, is a judicial function that a state agency, such as the PSC, lacks the constitutional authority to issue. *State Tax Comm'n v. Admin. Hearing Comm'n,* 641 S.W.2d 69, 75 (Mo. banc 1982) (internal citations omitted). Moreover, it has long been held that the PSC has no power to declare the validity or invalidity of a city ordinance. *State ex rel. Kansas City Terminal Ry. Co. v. Pub. Serv. Comm'n,* 308 Mo. 359, 272 S.W. 957, 960 (1925).

Thus, we agree with the trial court that it had subject matter jurisdiction and authority to resolve the matter without it first being reviewed by the PSC. *See J.C. W. ex rel. Webb v. Wyciskalla,* 275 S.W.3d 249, 253 (Mo. banc 2009). The Babbs' motion to strike the PSC's amended brief is denied, but the PSC's arguments are unpersuasive.

With regard to the Babbs' motion to dismiss the appeal on the basis of mootness, that motion is also denied.

### Conclusion

The trial court erred in granting summary judgment on Count I of the petition declaring the City ordinance invalid because the court did not have before it uncontroverted evidence of an actual conflict between the City's ordinance and the state statutes and regulations. With regard to Point Three, the City appealed summary judgment on Count III of the petition on the sole basis that the petition was untimely under 89.110. We determine that the petition was properly filed under section 536.150 and thus was not subject to the 89.110 filing deadline. Significantly, the City did not appeal the trial court's finding on Count III that the Board's denial of the Babbs' SUP was arbitrary and capricious. The judgment in favor of the Babbs on this basis under Count III presupposes the validity of the City's ordinance, and is, in effect, an alternative basis for the entry of judgment in favor of the Babbs on this Count. Because no appeal was taken as to this alternative basis for the entry of judgment, we have no grounds to review this finding by the trial court and we affirm the judgment as to Count III. Because we find no support for the argument that this was not a properly entered final judgment under Point Five, we affirm on that basis as well.

All concur.