

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| DIANA CROUCH, et al., | ) |
| | ) |
| Appellants, | ) |
| | )   **WD76824** |
| v. | ) |
| | )   **OPINION FILED:** |
| | )   **August 5, 2014** |
| CITY OF KANSAS CITY, MISSOURI, | ) |
| | ) |
| Respondent. | ) |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Patrick W. Campbell, Judge**

**Before Division One:** Joseph M. Ellis, Presiding Judge, and
Karen King Mitchell and Anthony Rex Gabbert, Judges

Appellants, Diana and Dennis Crouch, appeal from the circuit court's grant of summary judgment in favor of Respondent, the City of Kansas City (City), on their claim for wrongful death of their mother, Dorothea Crouch. Appellants allege that Dorothea died as the result of a head injury suffered from a fall that occurred when employees of the Kansas City Fire Department were attempting to carry her up the stairs in her home. The circuit court found that the City was entitled to sovereign immunity, and it granted summary judgment in the City's favor. We affirm.

## Factual and Procedural Background[1]

On April 16, 2012, Diana Crouch called the Kansas City Fire Department (KCFD), seeking help for her mother, Dorothea Crouch, in getting up the stairs to Dorothea's living quarters in the home they shared.[2] The situation was a non-emergency situation, and apart from an inability to climb the stairs that particular day, Dorothea was otherwise fine.[3]

The KCFD responds to approximately 25,000 non-emergency calls per year. In 2012, the KCFD responded to 2,671 "lift assist" calls like the one made by Diana. The "lift assist" service was authorized by the fire chief and made available to anyone in the community.

In response to Diana's call, the KCFD sent four firemen (a standard number for call response) to the Crouch residence. When they arrived, Diana greeted them at the door and led them to the stairwell where Dorothea was seated in a wheelchair at the bottom of the stairs. The firemen discussed how best to move Dorothea and ultimately decided to put her in a wooden dining room chair and have two firemen carry her up the stairs, with one holding the back of the chair and the other holding the front two legs of the chair.

On the way up the stairs, the chair broke and Dorothea fell, hitting her head on the broken chair and the floor. Diana contacted Dorothea's doctor, who advised Diana to ice the injury, monitor Dorothea for signs of a concussion, and wake Dorothea every hour during the night to check her for signs of concussion. Dorothea appeared fine that evening and overnight, but complained of a severe headache when she awoke the next morning. Diana called 911, and an

---

[1] "When considering an appeal from the grant of summary judgment, we review the record in the light most favorable to the party against whom the judgment was entered." *Babb v. Mo. Pub. Serv. Comm'n*, 414 S.W.3d 64, 67 n.3 (Mo. App. W.D. 2013).

[2] Because of the shared last name, we will refer to the various members of the Crouch family by first name. No familiarity or disrespect is intended.

[3] The Crouches had contacted the KCFD on one previous occasion for the same reason. It appears from the record that Dorothea was normally able to climb the stairs on her own or with some assistance from Diana. Although Diana told the dispatcher that she had taken her mother to the heart doctor earlier that day, she also indicated that the call was not an emergency.

ambulance took Dorothea to the hospital, where she was diagnosed with intracranial hemorrhaging, which led to her death two days later.

Diana and Dennis, Dorothea's two children, sued the City for wrongful death, alleging that the KCFD firemen acted negligently in the manner in which they chose to move Dorothea up the stairs. In their petition, the Crouch children alleged that the firemen were acting as agents, servants, or employees of the City and that they were not performing a governmental function, but a proprietary one, in that their act of assisting Dorothea to the second floor was for the convenience of but one of the City's citizens and not for the common good of all.

After a period of discovery, the City moved for summary judgment, asserting that it was entitled to sovereign immunity insofar as the firemen were engaged in a governmental function during the actions leading to Dorothea's death. Alternatively, the City argued that it was protected by the public duty doctrine to the extent that its employees (the firemen) were protected. The City supported its argument by referring to the duties and powers of the KCFD and its fire chief as laid out in the City's charter and ordinances and arguing that the activities of the fire department generally, and lift assists specifically, are for the benefit of the general public.

In response, the Crouches argued that the City, as a municipal corporation, performed dual functions and that, even though the establishment and operation of a fire department are typically governmental functions, the non-emergency, lift-assist response was not. The Crouches argued that the KCFD's response to non-emergency lift-assist calls was merely for the benefit and convenience of the City's own citizens and, therefore, was a proprietary function not entitled to sovereign immunity. The Crouches further argued that the public duty doctrine was inapplicable because they had not sued the individual firemen, and the public duty doctrine could not protect the City in its performance of proprietary functions.

The circuit court granted the City's motion for summary judgment, finding that "[t]he 'lift assist' calls performed by Defendant serve to safeguard and preserve the health of those citizens that are unable to mobilize themselves," and that the service was "performed for the common good of all." The court further determined that the City did not receive any benefit from providing "lift assist" services and, therefore, the service constituted a governmental function, entitling the City to sovereign immunity. The Crouches appeal.

**Standard of Review**

Because "[t]he propriety of summary judgment is purely an issue of law," we review the grant of summary judgment de novo. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). "When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered." *Id*. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id*. "We accord the non-movant the benefit of all reasonable inferences from the record." *Id*.

"The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." *Id*. "As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment." *Id*.

**Analysis**

The Crouches raise two points on appeal: first, they claim that the circuit court erred in finding that the non-emergency lift-assist function was governmental and, thus, that sovereign

4

immunity applied; and second, they claim that the public duty doctrine does not apply because the Crouches did not sue the firemen individually as employees of the City. Because the circuit court's entry of summary judgment based on sovereign immunity was correct, we affirm.

The court below granted summary judgment in favor of the City on the ground that the City was protected from liability by sovereign immunity. "'Under the doctrine of sovereign immunity, public entities are immune from suit for their negligent acts unless the General Assembly has expressly waived such immunity.'" *Phelps v. City of Kansas City*, 371 S.W.3d 909, 912 (Mo. App. W.D. 2012) (quoting *Kraus v. Hy-Vee, Inc.*, 147 S.W.3d 907, 914 (Mo. App. W.D. 2004)). The General Assembly has expressly waived sovereign immunity where a person sustains injuries either: (1) "directly resulting from the negligent acts or omissions by public employees arising out of the operation of motor vehicles or motorized vehicles within the course of their employment" or (2) "caused by [a dangerous] condition of a public entity's property." § 537.600.1(1)-(2).[4] The General Assembly has further waived sovereign immunity where a public entity has purchased liability insurance, but the waiver applies only up to "the maximum amount of and only for the purposes covered by such policy of insurance." § 537.610.1. Apart from these express waivers,[5] "sovereign or governmental tort immunity as [it] existed at common law in this state prior to September 12, 1977, . . . remain[s] in full force and effect." § 537.600.1.

Under the common law, a municipality is not entitled to full sovereign immunity. *Kunzie v. City of Olivette*, 184 S.W.3d 570, 574 (Mo. banc 2006). Because municipalities operate as both political subdivisions of the state and independent corporations, they perform both governmental and non-governmental functions. *St. Joseph Light & Power Co. v. Kaw Valley Tunneling, Inc.*, 589 S.W.2d 260, 267 (Mo. banc 1979). And because sovereign immunity

---

[4] All statutory references are to the Missouri Revised Statutes 2000, as updated through the 2012 Cumulative Supplement, unless otherwise indicated.

[5] It does not appear that any of the statutory waivers apply to the facts of this case.

protects the state, as a sovereign, municipalities are cloaked with immunity only when acting as an arm of the state. Thus, "unlike state entities which receive full sovereign immunity, municipalities are entitled to sovereign immunity only when engaged in 'governmental' functions, but not 'proprietary' functions." *Richardson v. City of St. Louis*, 293 S.W.3d 133, 136-37 (Mo. App. E.D. 2009). "The distinction between the governmental and proprietary functions of municipalities was drawn by the courts in order to impose common law liability on municipal corporations for the negligence of their agents, servants or officers in the execution of *corporate* powers and duties." *State ex rel. Askew v. Kopp*, 330 S.W.2d 882, 890 (Mo. 1960) (emphasis added).[6]

As the moving party seeking summary judgment, the City bore the burden of demonstrating that it was entitled to judgment as a matter of law on the Crouches' petition. Rule 74.04(c). "Whether sovereign immunity applies to a defendant is . . . a question of law." *Kreutz v. Curators of Univ. of Mo.*, 363 S.W.3d 61, 63-64 (Mo. App. W.D. 2011). And "Missouri courts have routinely held that sovereign immunity is not an affirmative defense and that the plaintiff bears the burden of pleading with specificity facts giving rise to an exception to sovereign immunity when suing a public entity." *Richardson*, 293 S.W.3d at 137.

---

[6] "The distinction's historical roots . . . pre-date the Revolutionary War." Janice C. Griffith, Local Government Contracts: Escaping From the Governmental/Proprietary Maze, 75 Iowa L. Rev. 277, 299 (1990).

> During the colonial period municipalities performed many functions that we think of today as the regimen of private enterprise. Except for the New England towns, American municipalities were modeled after their English counterparts, which served as centers of trade and industry. These chartered municipal corporations constructed wharves, built jetties, and operated markets to facilitate trade. They also controlled the supply and distribution of goods within their mercantile economies. They restricted the numbers and types of artisans and traders, granted monopolies to designated inhabitants, and regulated the pricing and quality of goods.

*Id.*

Here, the City moved for summary judgment on the ground that the undisputed material facts demonstrated that the fire department was acting in a governmental capacity, as a matter of law.

> [O]nce a movant has met the burden imposed by Rule 74.04(c) by establishing a right to judgment as a matter of law, the non-movant's *only* recourse is to show—by affidavit, depositions, answers to interrogatories, or admissions on file—that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed.

*ITT Commercial Fin. Corp.*, 854 S.W.2d at 381. "If the non-movant cannot contradict the showing of the movant, judgment is properly entered against the non-movant because the movant has already established a right to judgment as a matter of law." *Id.* The Crouches' response to the City's motion did not identify any genuine dispute as to the material facts underlying the City's assertion that its fire department was acting in a governmental capacity. Rather, the Crouches merely disputed whether the undisputed facts supported the City's assertion that the fire department's actions were governmental instead of proprietary, as a matter of law.

The distinction between governmental and proprietary functions is a murky one. "A 'maze of inconsistency' has developed in suits against cities, producing 'uneven and unequal results which defy understanding.'" *Jones v. State Highway Comm'n*, 557 S.W.2d 225, 229 (Mo. banc 1977) (quoting *O'Dell v. Sch. Dist. of Independence*, 521 S.W.2d 403, 417 (Mo. banc 1975) (Finch, J., dissenting)), abrogated by § 537.600.1. Though frequently criticized and described by our courts as "obscure," the dichotomy nevertheless remains the benchmark by which immunity is determined for tort claims against municipalities.[7]

---

[7] *See, e.g., Bennartz v. City of Columbia*, 300 S.W.3d 251, 259 (Mo. App. W.D. 2009); *Gregg v. City of Kansas City*, 272 S.W.3d 353, 361 (Mo. App. W.D. 2008); *Aiello v. St. Louis Cmty. Coll. Dist.*, 830 S.W.2d 556, 558 (Mo. App. E.D. 1992).

The distinction has been criticized as a false dichotomy that "is more readily stated in theory rather than applied in actual practice." *City of Chesapeake v. Cunningham*, 604 S.E.2d 420, 427 (Va. 2004); *see also Morningstar Water Users Ass'n, Inc. v. Farmington Mun. Sch. Dist. No. 5*, 901 P.2d 725, 731 (N.M. 1995). It has also been deemed "a mechanically applied rule that 'provides the perfect mask for judicial balancing of competing

In Missouri, governmental functions are those "'performed by the municipality as an agent of the state,'" *Bennartz*, 300 S.W.3d at 259 (quoting *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo. App. E.D. 2007)), meaning that they are for the benefit of the general public, *Kunzie*, 184 S.W.3d at 574, or "the common good of all," such as "keeping the peace, enforcing laws and ordinances, and preserving the public health." *Parish*, 231 S.W.3d at 242.[8]

Proprietary functions, on the other hand, have been described as those "benefiting or profiting the municipality in its corporate capacity," *Kunzie*, 184 S.W.3d at 574, in that they benefit or provide services or conveniences "to a municipality's own citizens." *Bennartz*, 300 S.W.3d at 259; *see also St. Joseph Light & Power Co.*, 589 S.W.2d at 267.[9]

Because these definitions contain very broad, malleable terms, our courts have also suggested guiding principles for their application. In deciding whether a particular function is governmental or proprietary, "a court must look to the nature of the activity performed," *St. Joseph Light & Power Co.*, 589 S.W.2d at 267, "not the nature of the tort." *Jones*, 557 S.W.2d at 229. "[T]he nature of the particular defendant's conduct is often less important than the generic nature of the activity." *State ex rel. Bd. of Trs. of City of N. Kansas City Mem'l Hosp. v. Russell*, 843 S.W.2d 353, 359 (Mo. banc 1992). "Rather than examining the motives of the city employees who were performing the function, the analysis focuses on the motives of the

equities and policies,'" *Morningstar*, 901 P.2d at 731-32 (quoting Griffith, *supra* note 6), and nothing more than "illusory, elusive, arbitrary, unworkable and a quagmire." *Considine v. City of Waterbury*, 905 A.2d 70, 81 (Conn. 2006).

[8] Examples of functions of a municipality found to be governmental include: establishment and operation of schools, creation of municipal fire departments, provision of water for preventing fires and keeping the city sanitary, and exercise of legislative and judicial powers, *Bennartz*, 300 S.W.3d at 259; operation of a city hospital, *Richardson v. City of St. Louis*, 293 S.W.3d 133, 137 (Mo. App. E.D. 2009); maintenance of a police force, *Oberkramer v. City of Ellisville*, 650 S.W.2d 286, 296 (Mo. App. E.D. 1983); provision of airport security, *Gregg*, 272 S.W.3d at 361-62; and redevelopment of blighted areas, *Parish*, 231 S.W.3d at 242-43.

[9] Examples of functions of a municipality found to be proprietary include: operation of a municipal drainage system, *Thomas v. City of Kansas City*, 92 S.W.3d 92, 101 (Mo. App. W.D. 2002); sewer construction, *St. Joseph Light & Power Co. v. Kaw Valley Tunneling, Inc.*, 589 S.W.2d 260, 267 (Mo. banc 1979); provision of water for private use, *Parish v. Novus Equities Co.*, 231 S.W.3d 236, 242 (Mo. App. E.D. 2007); demolition of private property, *Larabee v. City of Kansas City*, 697 S.W.2d 177, 179-80 (Mo. App. W.D. 1985); and street sweeping, *Davis v. City of St. Louis*, 612 S.W.2d 812, 815 (Mo. App. E.D. 1981).

legislature that conferred the power upon all municipalities." *Id*. "The status of a function of a city does not vary from day to day with the whims of the particular people elected or appointed to municipal offices." *Id*.

Functions that are otherwise proprietary in nature cannot be deemed governmental merely because they are performed by those typically engaged in governmental functions. *Larabee v. City of Kansas City*, 697 S.W.2d 177, 180 (Mo. App. W.D. 1985). Likewise, functions that are otherwise governmental are not transformed into proprietary functions merely because they generate a profit or are accompanied by a fee. *Richardson*, 293 S.W.3d at 138. And "negligent performance of a public function, even grossly negligent performance, [does not] make a governmental function proprietary." *State ex rel. City of Nevada v. Bickel*, 267 S.W.3d 780, 783 (Mo. App. W.D. 2008).

The circuit court determined that "[t]he 'lift assist' calls performed by Defendant serve to safeguard and preserve the health of those citizens that are unable to mobilize themselves," and that the service was "performed for the common good of all." The court further determined that the City did not receive any benefit from providing "lift assist" service and, therefore, the service constituted a governmental function, entitling the City to sovereign immunity.

The Crouches argue that the circuit court's determination was erroneous for two reasons: first, because the department was not responding to an emergency when providing the lift assist, the service was provided as a convenience to individual citizens, rather than for the good of all; and second, the actions were not authorized by the City's charter and ordinances and were, therefore, proprietary. We reject both of these arguments.

First, the Crouches suggest that the function is inherently for the convenience of the City's citizens (and therefore proprietary), given that it is a non-emergency function performed at

9

the request of an individual citizen. The Crouches argue that the non-emergency nature of the service suggests that the fire department's response was merely optional and therefore a simple convenience for the requesting citizen. We disagree.

The mere absence of an emergency does not establish that a function performed by a municipal entity is proprietary. There are many non-emergency functions that are considered governmental, such as the establishment and operation of schools, the provision of water for keeping the city sanitary, the exercise of legislative and judicial powers, the operation of a city hospital, and the redevelopment of blighted areas. *See, e.g., Bennartz*, 300 S.W.3d at 259; *Richardson*, 293 S.W.3d at 137; *Parish*, 231 S.W.3d at 242-43. A municipality acts within its governmental capacity even when offering preventative services that benefit the public health and safety, such as the provision of health care services, a police force, airport security, and water for the purpose of fighting fires. *See Bd. of Trs. of City of N. Kansas City Mem'l Hosp*., 843 S.W.2d at 359; *Bennartz*, 300 S.W.3d at 259; *Oberkramer v. City of Ellisville*, 650 S.W.2d 286, 296 (Mo. App. E.D. 1983); *Gregg v. City of Kansas City*, 272 S.W.3d 353 (Mo. App. W.D. 2008). Fire departments provide a number of preventative services designed to protect public health. For example, fire departments conduct heat checks (checking on residents that do not have access to air-conditioning when temperatures are high) to avoid heat-related illness and death. The department need not wait until there is an emergency to be acting in a governmental capacity, if early preventative steps serve to protect public health and safety.

Further, the fact that non-emergency lift assists, like the one performed in this case, directly benefit only the requesting citizen and his or her caretakers does not render the function proprietary. In many cases, the services provided by municipalities immediately benefit only the citizen at issue, but that fact does not render an otherwise governmental function proprietary.

10

For example, when an individual receives care from a municipal hospital for a broken arm, that citizen is the only person benefited by that particular health service, but that does not negate the fact that a city hospital protects the health and safety of the public generally. Here, the service was available to the public generally, and serves to protect the health and safety of individuals that suffered mobility issues (as well as their caregivers) by preventing them from taking unnecessary risks in climbing the stairs on their own. Thus, the Crouches' argument that non-emergency services are by their nature proprietary is rejected.

The Crouches' second argument again focuses on the non-emergency nature of lift assists. They argue that the City charter identifies the activities of the fire department only as fighting fires and responding to emergency situations. Thus, they conclude, because non-emergency lift assists are *not* expressly authorized by either the charter or ordinances, they are a proprietary function. We again disagree.

Although the City's charter and ordinances do not authorize the *fire department* to engage in non-emergency lift assists,[10] that does not mean that the *City* lacks authority to undertake this function. In the case of constitutional charter cities, like Kansas City, the primary source of legal authority is the Missouri Constitution, which provides:

> Any city which adopts or has adopted a charter for its own government, shall have all powers which the general assembly of the state of Missouri has authority to confer upon any city, provided such powers are consistent with the constitution of this state and are not limited or denied either by the charter so adopted or by statute. Such a city shall, in addition to its home rule powers, have all powers conferred by law.

---

[10] The City argues that the charter and ordinances do, in fact, authorize the fire department to engage in these activities, through the "other assigned duties" provision of § 408(a)(6) of the charter. We disagree. Though the charter and ordinances authorize the department to perform several delineated duties (*not* including non-emergency lift assists), as well as "such other duties as may be prescribed by law," and though the fire chief "approved the use of fire department personnel in 'lift assist' calls," KANSAS CITY, MO., MUN. CHARTER §§ 401, 2-231 (2007), *available at* https://library.municode.com/index.aspx?clientId=10156, the fire chief's approval does not constitute a "dut[y] prescribed by law." It seems that the fire chief, rather than dictating non-emergency lift-assist response as a duty of the fire department by rule or regulation, has simply agreed to provide this service.

Mo. Const. art. VI, § 19(a). No one has suggested that the constitution or statutes limit the City's authority to provide non-emergency lift assists. Therefore, the question is whether, by delegating only certain categories of duties to the fire department, the City limited or rejected *its* authority to provide non-emergency lift assists. *See State ex inf. Hannah ex rel. Christ v. City of St. Charles*, 676 S.W.2d 508, 512 (Mo. banc 1984) (noting that pursuant to article VI, § 19(a) a charter is like a shield that keeps away powers that would otherwise vest in the city). The charter's language in § 408 does not clearly reject or limit the City's authority to perform functions such as non-emergency lift assists. Thus, the Crouches' argument does not support a finding that the fire department's actions were a proprietary function.

That being said, even if the charter or ordinances had expressly authorized the fire department to engage in non-emergency lift assists, that fact alone would not dictate that such actions be deemed governmental. That the City, through its charter, assigned a function to one of its departments does not automatically make that function governmental in nature.[11] Rather, as a municipal entity, fire departments can engage in both governmental and proprietary functions. Thus, we must look to the specific activity in this case—providing a non-emergency lift assist—to determine in which capacity the fire department was acting. And it was the Crouches' burden to demonstrate a proprietary capacity.

"Sovereign immunity is the rule rather than the exception." *Benoit v. Mo. Highway & Transp. Comm'n*, 33 S.W.3d 663, 673 (Mo. App. S.D. 2000). Consequently, when an individual

---

[11] The City also argues that "[i]t is axiomatic . . . that the activities of [a] fire department are for the public good, and therefore a governmental function." This analysis, however, is too simplistic. The identity of the person or entity performing the function does not determine its character. *State ex rel. Bd. of Trs. of City of N. Kansas City Mem'l Hosp. v. Russell*, 843 S.W.2d 353, 359 (Mo. banc 1992); *Larabee*, 697 S.W.2d at 180; *Rodgers v. Kansas City*, 327 S.W.2d 478, 481-86 (Mo. App. 1959). While certainly a municipal fire department performs many governmental functions, and the creation and operation of a fire department are, themselves, governmental functions, the fact that a fire department performs an act does not automatically cloak the act with sovereign immunity. *See Larabee*, 697 S.W.2d at 179-80 ("The negligent act in question cannot be protected by labeling it part of the firefighting function.").

sues a municipality, it is that individual's burden to demonstrate that the municipality was engaged in a proprietary function at the time of the allegedly tortious conduct, thus subjecting it to liability. *See Richardson*, 293 S.W.3d at 137. If the individual fails to meet this burden, the function will be deemed governmental, and immunity will apply.

Here, the fire department's conduct of engaging in lift assists served to protect the health and safety of the general public. The Crouches do not claim, nor do they attempt to demonstrate, that this function either did *not* serve to protect public health and safety or only incidentally benefited public health and safety. *See Davis*, 612 S.W.2d at 815 ("[I]t would be unjust to allow a municipality to escape responsibility for the negligent performance of [a] substantially proprietary duty simply because public health benefits incidentally from its performance."). The Crouches' claims all hinge on the fact that the service is provided in non-emergency situations. Reliance on this fact alone, however, is not sufficient to meet their burden. Thus, we find the circuit court's grant of summary judgment to be correct. Accordingly, the grant of summary judgment is affirmed. In light of this disposition, we need not consider the Crouches' second point on appeal.

**Conclusion**

The circuit court did not err in granting summary judgment in favor of the City on the Crouches' wrongful death claim. Thus, its judgment is affirmed.

_____
Karen King Mitchell, Judge

Joseph M. Ellis, Presiding Judge, and
Anthony Rex Gabbert, Judge, concur.

13